IN THE MATTER OF KATHLEEN FARRELL.

Argued November 5, 1986—Decided June 24, 1987.

338

*Peter R. Strohm* and *John F. Gelson* argued the cause for appellant, Peter R. Strohm, Guardian *ad litem* (*Rothstein, Mandell, Strohm & Gelson,* attorneys).

*Joseph Purrazzella* argued the cause for respondent, Francis Farrell.

*John R. Heher* submitted a brief on behalf of *amicus curiae* New Jersey Hospital Association (*Smith, Stratton, Wise, He-her & Brennan,* attorneys; *John Heher* and *Wendy L. Mager,* on the brief).

*Fenalla Rouse* and *Elena N. Cohen,* members of the New York bar, and *Jo Anne C. Adlerstein* submitted a brief on behalf of *amicus curiae* Society for the Right to Die, Inc. (*Stern, Dubrow & Marcus,* attorneys).

The opinion of the Court was delivered by

GARIBALDI, J.

Death comes to everyone. However, in our society, due to great advances in medical knowledge and technology over the last few decades, death does not come suddenly or completely unexpectedly to most people. *President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment* 15 (1983) (hereinafter *President's Commission Report* ).[1] Instead, most people who die are under the treatment of health care professionals who are able to continue physical existence for human beings "even when most of our physical and mental capacities have been irrevocably lost." *In re Conroy,* 98 *N.J.* 321, 343 (1985). While medical advances have made it possible to forestall and cure certain illnesses previously considered fatal, they also have prolonged the slow deterioration and death of some patients. Sophisticated life-sustaining

---

[1]The President's Commission, established by Congress in 1978, consisted of ethicists, lawyers, doctors, theologians and others. *See* 42 *U.S.C.* § 300v (1982).

medical technology has made it possible to hold some people on the threshold of death for an indeterminate period of time, "obfuscat[ing] the use of traditional definition of death." *In re Quinlan,* 70 *N.J.* 10, 27, *cert.* denied *sub nom. Garger v. New Jersey,* 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976). Questions of fate have thereby become matters of choice raising profound "moral, social, technological, philosophical, and legal questions involving the interplay of many disciplines." *Matter of Conroy, supra,* 98 *N.J.* at 344; *see Perspectives on J. Katz, The Silent World of Doctor and Patient,* 9 W. New Eng.L.Rev. 1 (1987).

We are faced with such issues in this case, and *In re Peter,* 108 *N.J.* 365 (1987), and *In re Jobes,* 108 *N.J.* 394 (1987), also decided today. Specifically, these three appeals concern the withdrawal of life-sustaining treatment from three women suffering from incurable and irreversible medical conditions. Because of their ages, places of residence, and medical conditions, none of their cases falls within the factual pattern of either of our seminal decisions, *Quinlan, supra,* 70 *N.J.* 10, or *Conroy, supra,* 98 *N.J.* 321. Kathleen Farrell, a thirty-seven-year-old, competent, terminally-ill patient suffering from amyotrophic lateral sclerosis (ALS), commonly known as Lou Gehrig's disease, died at home. Hilda Peter is a sixty-five-year-old nursing home resident in a persistent vegetative state, and Nancy Jobes is a thirty-one-year-old nursing home resident in a persistent vegetative state. Neither Ms. Peter nor Mrs. Jobes is expected to die within a year. The variety of these cases illustrates the infinite number of situations that call for decisionmaking about life-sustaining medical treatment. We recognize, as we did in *Conroy,* and as have numerous other courts, that given the fundamental societal questions that must be

resolved, the Legislature is the proper branch of government to set guidelines in this area:[2]

[2]On November 12, 1985, the Legislature created the "New Jersey Commission on Legal and Ethical Problems in the Delivery of Health Care" to study the issues created by the evolution of medical technology. The Commission is scheduled to report to the Governor, Legislature, and public on December 31, 1988, and every three years thereafter. *L.* 1985, c. 363 (codified at *N.J.S.A.* 52:9Y-2). Meanwhile, numerous bills that deal more specifically with termination of life-sustaining treatment are pending. *E.g., Death With Dignity Act,* S. 846 (1986) (introduced by Senator Russo); *Right to Die Act,* S. 947 (1986) (introduced by Senator Feldman); *Right to Die Act,* A. 564 (1986) (introduced by Assemblyman Bryant); *Medical Power of Attorney Decision Act,* A. 776 (1986) (introduced by Assemblyman Weidel).

The National Conference of Commissioners on Uniform States Laws has submitted a proposed uniform act recognizing the enforceability of "living wills" in certain limited situations. That model legislation, the Uniform Rights of the Terminally Ill Act, has not been formally adopted in New Jersey. But thirty-eight states and the District of Columbia have enacted laws in this area. *See* Alabama Natural Death Act, Ala. Code §§ 22-8A-1-10 (1981); Alaska Act Relating to the Rights of the Terminally Ill, Alaska Stat. § 18.12.010-.100 (1986); Arizona Medical Treatment Decision Act, Ariz.Rev.Stat.Ann. §§ 36-3201-3210 (1985); Arkansas Rights of the Terminally Ill or Permanently Unconscious Act, 1987 Ark. Acts 713; California Natural Death Act, Cal. Health & Safety Code §§ 7185-7195 (1976); Colorado Medical Treatment Decision Act, Colo.Rev.Stat. §§ 15-18-101-113; *see also* Colo.Rev.Stat. §§ 12-36-117 (1985); Connecticut Death with Dignity Act, Public Act No. 85-606 (1985); Delaware Death with Dignity Act, Del. Code Ann. tit. 16, §§ 2501-2509 (1982); District of Columbia Natural Death Act of 1981, D.C. Code Ann. §§ 6-2421-2430 (1982); Florida Life Prolonging Procedure Act, Fla.Stat., Chap. 84-58, §§ 765.01-.15 (1984); Georgia Living Wills Act, Ga. Code Ann. §§ 31-32-1-12 (1984) Amended, 1987 Ga. Laws 488; Hawaii Act, 1986 Hawaii Sess. Laws 338 (1986); Idaho Natural Death Act, Idaho Code §§ 39-4501-4508 (1977); Illinois Living Will Act, Ill.Ann.Stat. ch. 110 1/2 §§ 701-710 (Smith-Hurd 1984); Indiana Living Wills and Life-Prolonging Procedures Act, Ind. Code 16-8-11 (1985); Iowa Life-Sustaining Procedures Act, Iowa Code ch. 144A.1-144A.11 (1985) amended, H.F. 360 (1987 Sess., 72d Iowa Gen. Assembly; Kansas Natural Death Act, Kan.Stat.Ann. §§ 65-28, 101-109 (1979); Louisiana Life-Sustaining Procedures Act, La.Rev.Stat. 40:1299.58.1-.10 (1984, amend. 1985); Maine Living Wills Act, Me.Rev.Stat.Ann. tit. 22, ch. 710a (1985); Maryland Life-Sustaining Procedures Act, Md. Health General Code Ann. §§ 5-601-614, subtitle 6, Life-Sustaining Procedures (1985); Mississippi Natural Death Act, Miss. Code Ann. §§ 41-41-101-121 (1984); Missouri Death-Prolonging Procedures Act, Mo.Rev.Stat. §§ 459.010-459.055 (1985); Montana Living Will Act, Mont. Code Ann. §§ 50-9-101-104, §§ 50-9-111, 50-9-201-206 (1985); Nevada Withholding of Life-Sustaining Procedures Act, Nev.Rev.Stat. §§ 449.540-690 (1977); New Hampshire Living Wills Act, N.H.Rev.Stat.Ann. ch. 137H

Because the issue with all its ramifications is fraught with complexity and encompasses the interests of the law, both civil and criminal, medical ethics and social morality, it is not one which is well-suited for resolution in an adversary judicial proceeding. It is the type [of] issue which is more suitably addressed in the legislative forum, where fact finding can be less confined and the viewpoints of all interested institutions and disciplines can be presented and synthesized. In this manner only can the subject be dealt with comprehensively and the interests of all institutions and individuals be properly accommodated. [*Conroy, supra,* 98 *N.J.* 344–45, (quoting *Satz v. Perlmutter,* 379 *So.*2d 359, 360 (Fla.1980), *aff'g* 362 *So.*2d 160 (Fla.Dist.Ct.App.1978)).]

*Accord In re Barber,* 147 *Cal.App.*3d 1006, 1016–17, 195 *Cal. Rptr.* 484, 488 (Cal.Ct.App.1983); *Severns v. Wilmington Medical Center,* 421 *A.*2d 1334, 1346 (Del.1980); *In re Eichner,* 52 *N.Y.*2d 363, 382, 420 *N.E.*2d 64, 74, 438 *N.Y.S.*2d 266, 276, *cert. denied,* 454 *U.S.* 858, 102 *S.Ct.* 309, 70 *L.Ed.*2d 153 (1981); *In re Hamlin,* 102 *Wash.*2d 810, 821–22, 689 *P.*2d 1372, 1379 (1984).

Nevertheless, patients and their families and physicians are increasingly being faced with these difficult and complex decisions without legislative guidelines and under the threat of civil and criminal liability. Until the Legislature acts, it is to the courts that the public must look for the guidelines and procedures under which life-sustaining medical treatment may be withdrawn or withheld. Sensitive to the patients' rights to self-determination, but cognizant of the vulnerability of the

(1985); New Mexico Right to Die Act, N.M.Stat.Ann. §§ 24–7–1–11 (1977); North Carolina Right to Natural Death Act, N.C.Gen.Stat. §§ 90–320–322 (1977, amend. 1979, 1981, 1983); Oklahoma Natural Death Act, Okla.Stat. tit. 63, §§ 3101–3111 (1985); Oregon Rights with Respect to Terminal Illness Act, Or.Rev.Stat. §§ 97.050–.090 (1977, amend. 1983); South Carolina Death With Dignity Act, S.C. Code Ann. § 44–77–10–160 (1986); Tennessee Right to Natural Death Act, Tenn.Code Ann. §§ 32–11–101–111 (1983); Texas Natural Death Act, Tex.Stat.Ann. art. 4590h, (1977, amend. 1979, 1983, 1985); Utah Personal Choice and Living Will Act, Utah Code Ann. §§ 75–2–1101–1118 (1985); Vermont Terminal Care Document Act, Vt.Stat.Ann. tit. 18, §§ 5251–5262 and tit. 13, § 1801 (1982); Virginia Natural Death Act, Va. Code §§ 54–325.8:1–13 (1983); Washington Natural Death Act, Wash.Rev.Code Ann. §§ 70.122.010–70.122.905 (1979); West Virginia Natural Death Act, W.Va. Code Chap. 16 Art. 30 §§ 1–10 (1984); Wisconsin Natural Death Act, Wisc. Stat. §§ 154.01 *et seq.* (1984); Wyoming Living Will Act, Wy.Stat. §§ 33–26–144–152 (1984).

sick, we strive to protect all the relevant interests. We approach this task with great humility, for we recognize that "[t]o err either way—to keep a person alive under circumstances under which he would rather have been allowed to die, or to allow that person to die when he would have chosen to cling to life—would be deeply unfortunate." *Conroy, supra,* 98 *N.J.* at 343.

As in *Quinlan* and *Conroy,* we do not today determine whether life-sustaining medical treatment should be withdrawn from any of the patients in these cases, but rather define who may make such a decision and how it may be made.

## I

Although we stated the general principle that competent informed patients have the right to decline life-sustaining treatment in both *Quinlan, supra,* 70 *N.J.* at 39, and *Conroy, supra,* 98 *N.J.* at 347, each of those cases involved an incompetent institutionalized patient. In this case we deal for the first time with the right of a competent, terminally-ill adult patient living at home to withdraw a life-sustaining respirator.

Kathleen married Francis Farrell in 1969. They had two children. Prior to her illness, Mrs. Farrell worked as a keypunch operator. In November 1982, she began to experience symptoms associated with ALS, a disorder of the nervous system that results in degeneration of the victim's muscles. Although it eventually renders a patient incapable of movement, ALS does not impair the patient's mental faculties. The cause of the disease is unknown and there is no available treatment or cure. At the time of diagnosis, a victim's life expectancy even with life-sustaining treatment is usually one to three years.

After she became ill, Mrs. Farrell was admitted to a Philadelphia hospital where she underwent a tracheotomy and was

connected to a respirator.[3] In the autumn of 1983, she was released from the hospital because it could provide no further help for her condition. She returned home to live with her husband and their two teenage sons. Thereafter Mrs. Farrell was paralyzed and confined to bed in need of around-the-clock nursing care. Insurance covered all the expenses of this care.

In November 1985, after an experimental program that her husband characterized as "their last hope" had failed, Mrs. Farrell told him that she wanted to be disconnected from the respirator that sustained her breathing. Mr. Farrell told her doctor, John Pino, of her decision. The doctor advised Mrs. Farrell that she would die if her respirator were removed. Dr. Pino arranged for a psychologist, Dr. Jean Orost, to interview Mrs. Farrell. Dr. Orost determined that Mrs. Farrell was not clinically depressed and needed no psychiatric treatment. She concluded that Mrs. Farrell had made an informed, voluntary, and competent decision to remove the respirator. Dr. Orost continued to see Mrs. Farrell on a weekly basis from the time of their first interview in January 1986 until her death the following June.

On June 13, 1986, Francis Farrell filed a Chancery Division complaint seeking his appointment as Special Medical Guardian for his wife with specific authority to disconnect her respirator. He also sought a declaratory judgment that he and anyone who assisted him in disconnecting her respirator would incur no civil or criminal liability. The trial court executed an Order to Show Cause, which set June 16, 1986, as the return date, and appointed a guardian *ad litem* for the children.

Part of the trial was conducted at the Farrells' home in order to enable Mrs. Farrell to testify. The court described Mrs. Farrell's medical condition at the time of the trial as follows:

---

[3]It is worth noting that Mrs. Farrell refused to allow the insertion of a nasogastric tube and the nurses were instructed not to resuscitate her. No issues arising out of those directives are before the Court.

Mrs. Farrell presently appears to be a very fragile woman, weighing less than 100 pounds. In December 1982 she weighed 161 pounds. She has no control over her hands, arms, feet or legs, is incontinent as to bowel, and has difficulty with bladder function. She has difficulty in swallowing and is fed liquids, such as fruit juices, with a syringe by nurses who attend to her needs 24 hours a day. She is incapable of taking any solid foods by mouth. She is able to open and close her eyes and can see but has difficulty in talking. During her testimony, a court reporter took down what she said, and her husband at times repeated her answers to questions. Her answers were generally limited to yes or no, and at times an alphabet board was used to be certain her answer was understood. Her mouth tended to fill up with saliva and made her answers difficult to understand at times. When her children and better days were discussed with Mrs. Farrell, her eyes filled with tears and her husband assisted her in blowing her nose. She is incapable of moving her head, neck, or any other part of her body. On occasion she is put in a reclining chair and can watch television although she stated she usually falls asleep. She has pain in her arms and back, but medication does relieve it to some extent.

[*In re Farrell, supra*, 212 *N.J.Super.* at 296–97.]

At the trial, Mrs. Farrell testified that she had discussed her decision to withdraw the respirator with her husband, their two sons, her parents, her sister, and her psychologist, Dr. Orost. These discussions had been upsetting, but resulted in open and full communication among all the parties. Mrs. Farrell had also discussed the consequences of her decision with a respiratory specialist, Dr. Sollami. When Mrs. Farrell was asked why she had decided to disconnect her respirator and to let nature take its course, she responded, "I'm tired of suffering."

Dr. Orost testified that Mrs. Farrell's decision was not the result of a mere whim or casual decision. The doctor's opinion was based on the weekly discussions she had been having with Mrs. Farrell over the prior six months. Additionally, a Board-certified psychologist examined Mrs. Farrell at the request of the attorney for the children's guardian. He testified that she was competent to make the decision.

After closing arguments on June 23, 1986, the trial court granted all the relief that Mr. Farrell had requested, but stayed his order pending appellate review. The next day Peter Strohm, the guardian for the children, filed a notice of appeal with the Appellate Division and petitioned this court for direct certification. On June 25, 1986, Mr. Farrell's counsel filed a

letter memorandum joining in the request of the guardian.[4]
We granted certification on June 27, 1986. 104 *N.J.* 446.

On June 29, 1986, Mrs. Farrell died while still connected
to the respirator. Despite her death, both the guardian *ad
litem* and Mr. Farrell have urged us to address her case and
formulate guidelines that might aid future patients, their loved
ones, and their physicians in dealing with similar situations.
Because of the extreme importance of the issue and the inevita-
bility of cases like this one arising in the future, *see In re
Conroy, supra,* 98 *N.J.* at 342, we agree to render a decision on
the merits.

## II

In resolving this case, as well as the two other cases we
decide today, we build on the principles established in *Quinlan*
and *Conroy.* Hence, we start by reaffirming the well-recog-
nized common-law right of self-determination that "[e]very hu-
man being of adult years and sound mind has a right to
determine what shall be done with his own body...." *Schloen-
dorff v. Society of New York Hosp.,* 211 *N.Y.* 125, 129–30, 105
*N.E.* 92, 93 (1914) (Cardozo, J.). In *Conroy,* we stated that
"[t]he right of a person to control his own body is a basic
societal concept, long recognized in the common law." 98 *N.J.*
at 346. We explained that the doctrine of "informed consent"
was developed to protect the right to self-determination in
matters of medical treatment. *Id.* at 346–48. This doctrine
prescribes the "duty of a physician to disclose to a patient
information that will enable him to evaluate knowledgeably the
options available and the risks attendant upon each before
subjecting that patient to a course of treatment." *Perna v.
Pirozzi,* 92 *N.J.* 446, 459 (1983) (citations omitted); *see Conroy,
supra,* 98 *N.J.* at 346.

---

[4]We permitted the participation as *amici curiae* of the Society for the Right
to Die, Inc. and New Jersey Hospital Association.

As medical technology has been advancing, the doctrine of informed consent has been developing.[5] Thus, in *Conroy* we recognized the patient's right to give an informed refusal to medical treatment as the logical correlative of the right to give informed consent. We stated that "a competent adult person generally has the right to decline to have any medical treatment initiated or continued." *Conroy, supra*, 98 *N.J.* at 347.

While we held that a patient's right to refuse medical treatment even at the risk of personal injury or death is primarily protected by the common law, we recognized that it is also protected by the federal and state constitutional right of privacy. *See id.* at 348; *Quinlan, supra*, 70 *N.J.* at 38–42.

Numerous other courts have upheld the right of a competent patient to refuse medical treatment even if that decision will hasten his or her death. *See, e.g., Bouvia v. Superior Court*, 179 *Cal.App.*3d 1127, 225 *Cal.Rptr.* 297 (Cal.Ct.App.1986), *review denied* (June 5, 1986); *Bartling v. Superior Court*, 163 *Cal.App.*3d 186, 209 *Cal.Rptr.* 220 (Cal.Ct.App.1984); *In re Osborne*, 294 *A.*2d 372 (D.C.1972); *Satz v. Perlmutter*, 362 *So.* 2d 160 (Fla.Dist.Ct.App.1978), *aff'd*, 379 *So.*2d 359 (Fla.1980); *In re Brooks' Estate*, 32 *Ill.*2d 361, 205 *N.E.*2d 435 (1965); *Lane v. Candura*, 6 *Mass.App.Ct.* 377, 376 *N.E.*2d 1232 (1978), cited with approval in *Brophy v. New England Sinai Hosp.*, 398 *Mass.* 417, 497 *N.E.*2d 626 (1986); *In re Requena*, 213 *N.J.Super.* 443 (App.Div.1986), *aff'g* 213 *N.J.Super.* 475 (Ch. Div.1986); *In re Quackenbush*, 156 *N.J.Super.* 282 (Morris County Ct.1978), cited with approval in *Conroy, supra*, 98 *N.J.* at 347.

 Nevertheless, the right to refuse life-sustaining medical treatment is not absolute. The state has at least four potentially countervailing interests in sustaining a person's life:

---

5 *See generally* Schultz, *From Informed Consent to Patient Choice: A New Protected Interest, 95 Yale L.J.* 219 (1985) (describing the traditional limits of this doctrine, thereby illustrating how *Conroy* substantially expanded recognition of common-law freedom).

preserving life, preventing suicide, safeguarding the integrity of the medical profession and protecting innocent third parties. [*Conroy, supra,* 98 *N.J.* at 348–49 (citing *Satz v. Perlmutter, supra,* 362 *So.*2d at 162; *In re Spring,* 380 *Mass.* 629, 640, 405 *N.E.*2d 115, 123 (1980); *Commissioner of Correction v. Myers,* 379 *Mass.* 255, 261, 399 *N.E.*2d 452, 456 (1979); *Saikewicz v. Superintendent of Belchertown State School,* 373 *Mass.* 728, 738, 370 *N.E.*2d 417, 426 (1977); *In re Torres,* 357 *N.W.*2d 332, 339 (Minn.1984); *In re Colyer,* 99 *Wash.* 2d 114, 121, 660 *P.*2d 738, 743 (1983); *President's Commission Report, supra,* at 31–32; Note, *"In re Storar:* The Right to Die and Incompetent Patients,"* 43 *U.Pitt.L.Rev.* 1087, 1092 (1982)).]

When a party declines life-sustaining medical treatment, we balance the patient's common-law and constitutional rights against these four state interests. In this case, none of these interests, as we interpreted them in *Conroy,* nor their concert, outweighs Kathleen Farrell's rights to privacy and self-determination.

 The state's interest in preserving life embraces "an interest in preserving the life of the particular patient, and an interest in preserving the sanctity of all life." *Conroy, supra,* 98 *N.J.* at 349. Neither of those interests is compelling in this case. In *Conroy,* we decided that the value of life is desecrated not by a decision to refuse medical treatment but "by the failure to allow a competent human being the right of choice." *Id.* at 350 (quoting *Saikewicz v. Superintendent of Belchertown State School, supra,* 373 *Mass.* at 742, 370 *N.E.*2d at 426 (1977)). Thus, "[i]n cases that do not involve the protection of the actual or potential life of someone other than the decision-maker, the state's indirect and abstract interest in preserving the life of the competent patient generally gives way to the patient's much stronger personal interest in directing the course of his own life." *Conroy, supra,* 98 *N.J.* at 350.

 The next two state interests that we consider in rejection-of-treatment cases, i.e., preventing suicide and safeguarding the integrity of the medical profession, are not threatened by Mrs. Farrell's decision. In *Conroy,* we determined that the State's interest in preventing suicide is "motivated by, if not

encompassed within," its interest in preserving life. *Id.* (citing *N.J.S.A.* 30:4–26.3a and *N.J.S.A.* 2C:11–6.)[6] We explained that declining life sustaining medical treatment may not properly be viewed as an attempt to commit suicide. Refusing medical intervention merely allows the disease to take its natural course; if death were to eventually occur, it would be the result, primarily of the underlying disease, and not the result of a self-inflicted injury.

[*Id.* at 350–51.]

Courts in other jurisdictions have consistently agreed that refusal of life-supporting treatment does not amount to an attempt to commit suicide. *See, e.g., Bartling v. Superior Court, supra,* 163 *Cal.App.*3d at 195–97, 209 *Cal.Rptr.* at 225–26; *Foody v. Manchester Memorial Hosp.,* 40 *Conn.Supp.* 127, ——, 482 *A.*2d 713, 720 (Super.Ct.1984); *Satz v. Perlmutter, supra,* 362 *So.*2d at 162–63; *Brophy v. New England Sinai Hosp., supra,* 398 *Mass.* at 438, 497 *N.E.*2d at 638; *In re Eichner, supra,* 52 *N.Y.*2d at 377–78 n. 6, 420 *N.E.*2d at 71 n. 6, 438 *N.Y.S.*2d at 273 n. 6; *Leach v. Akron General Medical Center,* 68 *Ohio Misc.* 1, 10, 426 *N.E.*2d 809, 815 (Ohio Com.Pl. 1980); *Colyer, supra,* 99 *Wash.*2d at 121, 660 *P.*2d at 743.

Similarly, medical ethics create no tension in this case. Our review of well-established medical authorities finds them in unanimous support of the right of a competent and informed patient such as Mrs. Farrell to decline medical treatment. The New Jersey State Board of Medical Examiners has expressly stated that a "competent adult has the right to accept or refuse medical treatment" even when the refusal is "likely to result in natural death." *Policy Statement of the New Jersey State Board of Medical Examiners On Decision to Withhold or Withdraw Medical Treatment* 1–2 (July 1986). The New Jersey Chapter of the American College of Physicians has similarly concluded that "a competent individual has the legal right to

---

[6]*N.J.S.A.* 30:4–26.3a subjects "[a]ny person who attempts to commit suicide" to hospitalization when the person's behavior suggests the on-going existence of mental illness; *N.J.S.A.* 2C:11–6 provides that "[a] person who purposely aids another to commit suicide is guilty of a crime...."

make what some people might consider to be the 'wrong' decision" with regard to life-sustaining treatment. *New Jersey Chapter of the American College of Physicians Executive Council Policy Statement on Care of Irreversibly Ill Patients* (Oct. 1986); *accord Report of the Judicial Council of the American Medical Association,* 253 J. A.M.A. 2424 (1985); *American Hospital Association Policy Statement of Patients' Choices of Treatment Options* (Feb. 1985); Los Angeles County Medical and Bar Associations, *Principles and Guidelines Concerning the Foregoing of Life Sustaining Treatment for Adult Patients* (Jan. 1986); *Resolution of the Massachusetts Medical Society* (July 17, 1985).

The President's Commission also explicitly concluded that the authority of competent, informed patients to make health care decisions for themselves encompasses the prerogative to forgo treatment and allow death to occur:

> The voluntary choice of a competent and informed patient should determine whether or not life-sustaining therapy will be undertaken, just as such choices provide the basis for other decisions about medical treatment. Health care institutions and professionals should try to enhance patients' abilities to make decisions on their own behalf and to promote understanding of the available treatment options.... Health care professionals serve patients best by maintaining a presumption in favor of sustaining life, while recognizing that competent patients are entitled to choose to forego any treatments, including those that sustain life.
>
> [*President's Commission Report, supra,* at 3.]

Health care standards are not undermined by the medical authorities that support the right to self-determination that we recognize today. Even as patients enjoy control over their medical treatment, health-care professionals remain bound to act in consonance with specific ethical criteria. We realize that these criteria may conflict with some concepts of self-determination. In the case of such a conflict, a patient has no right to compel a health-care provider to violate generally accepted professional standards. *Cf. President's Commission Report, supra,* at 44. ("A health care professional has an obligation to allow a patient to choose from among medically acceptable treatment options ... or to reject all options. No one, however,

has an obligation to provide interventions that would, in his or her judgment, be countertherapeutic.")

When courts refuse to allow a competent patient to decline life-sustaining treatment, it is almost always because of the state's interest in protecting innocent third parties who would be harmed by the patient's decision. "[F]or example, courts have required competent adults to undergo medical procedures against their will if necessary to protect the public health, ... or to prevent the emotional and financial abandonment of the patient's minor children." *Conroy, supra,* 98 *N.J.* at 353; *see, e.g., Application of President & Directors of Georgetown College,* 331 *F.*2d 1000, 1008 (D.C.Cir.), *cert.* denied, 377 *U.S.* 978, 84 *S.Ct.* 1883, 12 *L.Ed.*2d 746 (1964) (ordering transfusion because of a mother's "responsibility to the community to care for her infant"); *Holmes v. Silver Cross Hosp.,* 340 *F.Supp.* 125, 130 (N.D.Ill.1972) (noting that a father can similarly be forced to undergo a transfusion if his refusal would devastate his dependents); *John F. Kennedy Memorial Hosp. v. Heston,* 58 *N.J.* 576 (1971) (ordering blood transfusion for a pregnant woman).

Although Mrs. Farrell left behind two teenage sons, her case is manifestly distinguishable from those in which a parent could be forced to accept treatment because his or her prospect for recovery was good and the parent's death threatened the security of a child or children. Mrs. Farrell did not disregard her children's interest when she decided to withdraw the respirator. In fact, she based her decision in part on her recognition that her medical condition had already put them under extreme stress. Moreover, Mr. Farrell's capacity to care for them in her absence is unquestioned. Therefore the state's interest in protecting innocent third parties does not militate against Mrs. Farrell's decision. *See In re Osborne, supra,* 294 *A.*2d 372, 374 (upholding patient's right to refuse treatment in part because patient had provided for his children); *cf. In re Brooks Estate, supra,* 32 *Ill.*2d at 369–70, 205 *N.E.*2d at 440 (upholding right to

refuse treatment) (noting that the decision might have been different if the patient had minor children who were put at risk by his decision).

■ The guardian *ad litem* appointed by the Court to protect the children concluded that they would not be harmed if the court granted relief. His position was based on personal meetings with the children and on a report he received from a psychiatrist who had interviewed them. However, we need not rely on his testimony. Where the evidence reveals a close, loving family like the Farrells, we presume that when the parents make medical decisions, they are concerned about and will protect their children's interests. *See infra*, 108 *N.J.* at 355–356; *see also Wisconsin v. Yoder*, 406 *U.S.* 205, 213–14, 92 *S.Ct.* 1526, 1532, 32 *L.Ed.*2d 15, 24 (1972) (upholding parents' rights to assume primary role in making decisions that will affect their children). A guardian *ad litem* for the children is, therefore, unnecessary in the case of a family like the Farrells.

In light of all of the foregoing, we hold that the state's interests did not outweigh Mrs. Farrell's right to withdraw her respirator. We find direct support for our conclusion in *Satz v. Perlmutter, supra*, 379 *So.*2d 359, in which the Florida Supreme Court similarly held that a competent patient suffering from ALS was entitled to discontinue his respirator.

## IV

Mindful that we heard this case in order to help future patients like Mrs. Farrell, and their families and doctors, we herewith summarize our analysis and set forth the procedures that will be applicable when competent patients who are living at home request the discontinuance of life-sustaining medical treatment.

First, it must be determined that the patient is competent [7] and properly informed about his or her prognosis, the alternative treatments available, and the risk involved in the withdrawal of the life-sustaining treatment. *See generally* Schultz, *supra,* 95 *Yale L.J.* at 233–48 (discussing how the increasing legal recognition of patients' interests in choosing among medical alternatives should increase the amount of medical information that doctors provide to them). Then it must be determined that the patient made his or her choice voluntarily and without coercion. After these assessments have been made, the patient's right to choose to disconnect the life-sustaining apparatus must be balanced against the four potentially countervailing state interests discussed above. Generally, a competent informed patient's "interest in freedom from nonconsensual invasion of her bodily integrity would outweigh any state interest." *Conroy, supra,* 98 *N.J.* at 355.

A competent patient's right to exercise his or her choice to refuse life-sustaining treatment does not vary depending on whether the patient is in a medical institution or at home. Many people wish to die at home in familiar surroundings. And, in many cases, hospitals discharge terminally- or irreversibly-ill patients. *President's Commission Report, supra,* at 103. Accordingly, medical care in the home, especially for terminally and irreversibly ill patients, is increasing. *See Congresswomen Discuss Home Care,* Caring, March 1986, at 44. Evidence of this trend is the development of hospice programs, which are premised on the belief that home is almost always the best place to die and that traditional medical care facilities, especially hospitals, often cannot properly accommodate the

---

[7] A competent patient has a clear understanding of the nature of his or her illness and prognosis, and of the risks and benefits of the proposed treatment, and has the capacity to reason and make judgments about that information. *Conroy, supra,* 98 *N.J.* at 347 (citing Wanzer, Adelstein, Cranford, Federman, Hook, Moertel, Safar, Stone, Tarssig & Van Eys, "The Physician's Responsibility Toward Hopelessly Ill Patients," 310 *New Eng.J.Med.* 955, 957 (1984)).

needs of their dying patients, and may be unnecessarily costly. *See President's Commission Report, supra,* at 112–14.

We see no reason to fear that a patient at home is more vulnerable than one in an institution. In fact, probably just the opposite is true. Presumably, the patient receiving life-sustaining treatment at home has a caring family or friend in attendance; otherwise, institutional care would be necessary. Our common human experience teaches us that family members and close friends care most and best for a patient. They offer love and support and concern, and have the best interests of the patient at heart. The importance of the family in medical treatment decisions is axiomatic.

[F]amilies commonly exhibit the greatest degree of concern about the welfare of ailing family members. It is they who come to the hospital and involve themselves in the sick person's care and comfort. Competent patients usually actively solicit the advice and counsel of family members in decisionmaking. Family members routinely ask questions of the medical staff about the patient's condition and prognosis; one study found they frequently asked more questions than patients themselves did. Family members, in fact, commonly act as advocates for patients in the hospital, looking out for their comfort, care, and best interests....

[Newman, *Treatment Refusals for the Critically Ill: Proposed Rules for the Family, the Physician and the State,* III *N.Y.L.Sch.* Human Rights Annual 35 (1985).]

*See generally* Dyck, *Self-Determination and Moral Responsibility,* 9 W. New Eng.L.Rev. 53, 55–60 (1987) (discussing family involvement in medical decisions in the context of the doctrine of self-determination).

The law has traditionally respected "the private realm of family life which the state cannot enter." *Prince v. Massachusetts,* 321 *U.S.* 158, 166, 64 *S.Ct.* 438, 442, 88 *L.Ed.* 645, 652 (1944). *See generally Moore v. City of East Cleveland,* 431 *U.S.* 494, 499–505, 97 *S.Ct.* 1932, 1935–38, 52 *L.Ed.*2d 531, 537–41 (1977) (explaining that intrusive governmental regulation of the family—extended as well as nuclear—is subject to strict judicial scrutiny). Accordingly, numerous statutes presume that family members care about and will care for one another. *See, e.g., N.J.S.A.* 3B:5–2–14 (intestate estate passes

to surviving spouses and heirs); *N.J.S.A.* 3B:12–25 (providing that spouse or heirs should normally be appointed when an incompetent needs a guardian for his person or estate); *N.J. S.A.* 3B:5–4 ("heirs" include children, parents, siblings, grandparents and other relatives).

We believe that this tradition of respect for and confidence in the family should ground our approach to the treatment of the sick. Whether a patient remains at home or not, therefore, should be the unencumbered decision of the patient and the patient's family with the advice of the doctor. Thus, we do not want to impose any restrictions or burdens on the competent patient's right to have life-sustaining treatment withdrawn if he or she is at home that would not be present if he or she were in a hospital or nursing home.

Nevertheless, we do realize that society must ensure that a patient who has decided to forgo life-sustaining treatment is competent; is informed about his or her prognosis, the medical alternatives available, and the risk involved; and has not been coerced. These issues are more easily resolved when the patient is in a hospital, nursing home, or other institution, because in those settings the patient is observed by more people. To protect the patient who is at home, we require that two non-attending physicians examine the patient to confirm that he or she is competent and is fully informed about his or her prognosis, the medical alternatives available, the risks involved, and the likely outcome if medical treatment is disconnected.[8] Adults are presumed competent. We trust that two independent physicians' determinations of competency sufficiently bolster that presumption in this context to preclude the need for any court action to establish the competency of the patient.

---

[8]The procedure we hereby establish for determining the competency of a patient at home who has decided to forgo life-sustaining treatment is likewise applicable to patients in hospitals and nursing homes.

■ Likewise judicial review of a competent patient's refusal of life-sustaining medical treatment is generally not appropriate. Only unusual circumstances, such as a conflict among the physicians, or among the family members, or between the physicians and the family or other health care professionals, would necessitate judicial intervention. "In most circumstances, patients are presumed to be capable of making decisions about their own care." *President's Commission Report, supra,* at 44. We see no necessity to depart from this general rule when a competent patient refuses life-sustaining treatment. The two independent confirmations of competency that we require should satisfy any questions that might later arise about the propriety of the withholding or withdrawal of treatment. Additionally, this procedural requirement should serve to forestall hasty medical decisions made while a patient is in an emotionally disturbed state because of a sudden illness or major catastrophe. *See id.* at 45 (noting the incidental capacity of a physician who is called to certify a patient's competency "to protect the individual from harms that arise from incapacities that themselves diminish the value of self-determination").

No matter how expedited, judicial intervention in this complex and sensitive area may take too long. Thus, it could infringe the very rights that we want to protect. The mere prospect of a cumbersome, intrusive, and expensive court proceeding during such an emotional and upsetting period in the lives of a patient and his or her loved ones would undoubtedly deter many persons from deciding to discontinue treatment. And even if the patient or the family were willing to submit to such a proceeding, it is likely that the patient's rights would nevertheless be frustrated by judicial deliberation. Too many patients have died before their right to reject treatment was vindicated in court. *See, e.g., Conroy, supra,* 98 *N.J.* at 342; *Bartling, supra,* 163 *Cal.App.*3d at 189, 209 *Cal.Rptr.* at 221; *John F. Kennedy Memorial Hosp. v. Bludworth,* 452 *So.*2d 921, 923 (Fla.1984); *Satz v. Perlmutter, supra,* 379 *So.*2d 359; *Corbett v. D'Alessandro,* 487 *So.*2d 368, 369 (Fla.Dist.Ct.App.),

review denied, 492 *So.*2d 1331 (Fla.1986); *In re L.H.R.*, 253 *Ga.* 439, 321 *S.E.*2d 716 (1984); *In re Spring*, 380 *Mass.* 629, 631 n. 1, 405 *N.E.*2d 115, 118 n. 1 (1980); *Sackiewicz, supra*, 373 *Mass.* at 734, 370 *N.E.*2d at 422; *In re Storar*, 52 *N.Y.*2d 363, 369 n. 1, 420 *N.E.*2d 64, 66 n. 1, 438 *N.Y.S.*2d 266, 268 n. 1, *cert.* denied, 454 *U.S.* 858, 102 *S.Ct.* 309, 70 *L.Ed.*2d 153 (1981); *In re Hamlin, supra*, 102 *Wash.*2d at 811, 689 *P.*2d at 1374. Even in this case—where the judicial system acted in an extremely prompt and efficient manner (only fourteen days elapsed between the filing of the complaint and the grant of the petition for certification)—we were unable to act in time. Mrs. Farrell died shackled to the respirator.

 Unfortunately, fears of civil and criminal liability have often forced family members or doctors to seek judicial intervention before they help a patient effectuate his or her decision to withdraw treatment. We realize that many competent patients like Mrs. Farrell are physically unable to separate themselves from life-support equipment. In light of this, we specifically hold that no civil or criminal liability will be incurred by any person who, in good faith [9] reliance on the procedures established in this opinion, withdraws life-sustaining treatment at the request of an informed and competent patient who has undergone the required independent medical examination described above.

The general rule that guides us today is that the patient, his or her loved ones, and his or her doctor are the people most properly involved in medical decisions. And in the case of a competent adult patient, it is primarily that person who should make the decision. A competent person's interest in her or his self-determination generally outweighs any countervailing interest the state might have. The requirements set forth in this

---

[9]In the case of a health-care professional, the obligation to act in accordance with generally accepted medical practices is a component of the duty of good faith.

opinion adequately protect the competent patient without unduly restricting the patient's right to determine his or her own medical treatment.

Hence, we conclude that a competent patient like Kathleen Farrell can choose to have her life-supporting treatment discontinued. Mrs. Farrell's right to live the remaining days of her life as she chose outweighed any interests the state had in compelling her to accept treatment.

Accordingly, we affirm the judgment of the trial court.

Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, and STEIN join in this opinion.

Justice HANDLER has filed a separate concurring opinion in which Justices CLIFFORD and POLLOCK join.

Justice O'HERN has filed a separate concurring opinion.

HANDLER, J., concurring.

I join in the majority's reasoning and conclusion. My added reasons for concurring in the Court's opinion are presented in my separate opinion in *In re Jobes*, 108 *N.J.* 394, 428 (1987).

The special significance of this case is the factual record that conveys to a high degree of confidence the soundness of affirming Mrs. Farrell's decision to discontinue the medical treatment that was precluding her from a natural and dignified death. Our confirmation of her decision under these circumstances would have effectuated her right of self-determination.

This case presents us, in the context of a right-to-die opinion, with a clear example of individual self-determination expressed by the informed wish of a competent patient. Because Mrs. Farrell was competent, she could express her wishes directly and she could be questioned to confirm that her decision was both voluntary and knowing. It is a prototypical example of individual self-determination, which provides the conceptual

foundation that can guide the application of similar principles to treatment decisions involving incompetent patients. This case underscores by contrast how much less certain we can be that treatment decisions made in the name of an incompetent patient effectuate her right of self-determination. *See Jobes, supra,* 108 *N.J.* at 433–37 (Handler, J., concurring). We are thus alerted to the need to consider and develop additional criteria to inform the medical treatment decision for incompetent patients. This will in many cases encompass objective factors bearing upon the patient's best interests to buttress, or, if necessary, to supplant, a treatment decision based on the earlier expressed wishes or views of the incompetent patient.

O'HERN, J., concurring.

"It has been said that '[t]he law always lags behind the most advanced thinking in every area. It must wait until the theologians and the moral leaders and events have created some common ground, some consensus.'" *Superintendent of Belchertown State School v. Saikewicz,* 373 *Mass.* 728, 736, 370 *N.E.* 2d 417, 423 (1977) (quoting Burger, "The Law and Medical Advances," 67 *Annals Internal Med.Supp.* 7, 15, 17 (1967)). Hence, *In re Conroy,* 98 *N.J.* 321, 387 (1985), did not attempt "to set forth guidelines for decision-making with respect to life-sustaining treatment in a variety of other situations that are not currently before us * * * [because] each case * * * poses its own unique difficulties."

Consequently, Justice Schreiber counseled:

We do not deem it advisable to attempt to resolve all such human dilemmas in the context of this case. It is preferable, in our view, to move slowly and to gain experience in this highly sensitive field. As we noted previously, the Legislature is better equipped than we to develop and frame a comprehensive plan for resolving these problems. [*Id.* at 387–88.]

It was not possible for the trial court in this case to move slowly. The ineluctable deterioration of Kathleen Farrell's health and the unutterable suffering occasioned by the artificial

prolongation of her breathing warranted the relief entered by that court. 212 *N.J.Super.* 294 (Ch.Div.1986).

I

There is no lack of moral, medical, or ethical consensus that a patient and physician, faced with inevitable death that is imminent in spite of the life support means used, need not prolong the suffering occasioned by the use of that means to no human purpose. In such circumstances, the patient may be permitted to choose to discontinue the life-sustaining apparatus, provided that the normal supportive care for the dying patient is continued.

The role of law in this process has been described thus:

Law is one of the basic means through which a society translates its values into policies and applies them to human conduct. Using the general rules embodied in statutes, regulations, and court decisions, society attempts judiciously to balance the degree to which various values may be pursued and to arbitrate situations in which serving one fully justified goal entails failing to serve another. With respect to foregoing life-sustaining treatment, law simultaneously allows such decisions (as an expression of the value of self-determination and well-being), circumscribes the practice (to safeguard well-being), and shapes social institutions and government programs (to advance equity and well-being and to protect self-determination). [President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Deciding to Forego Life-sustaining Treatment* 30 (1983) (hereinafter cited as *President's Commission Report*).]

In response to our decision in *Conroy,* the Legislature created a commission to:

a. Clarify the issues posed by a rapidly developing health and science technology and highlight the facts that appear to be most relevant for informed decision making by persons as it relates to their care and treatment;

b. Gather data about how New Jersey and other jurisdictions handle decision making regarding the termination and refusal of care and treatment;

c. Assess the need for additional programs and services relating to medical decision making;

d. Suggest improvements in public policy relating to medical treatment at various levels, not exclusively at the level of State government, and through various means including legislation;

e. Through its reports, offer guidance for people involved in making decisions, though not dictate particular choices on moral grounds. [*N.J.S.A.* 52:9Y–3.]

As we await the report of that commission and any additional legislative implementation, we must continue to hope, as this Court did in *In re Quinlan*, 70 *N.J.* 10, *cert. denied sub nom. Garger v. New Jersey*, 429 *U.S.* 922, 97 *S.Ct.* 319, 50 *L.Ed.*2d 289 (1976), that the case-by-case development of opinions "might be serviceable to some degree in ameliorating the professional problems under discussion." 70 *N.J.* at 49. Gradually, such decisions may develop lines of consensus regarding the moral and social values upon which future courts can draw. Baron, "Medicine and Human Rights: Emerging Substantive Standards and Procedural Protections for Medical Decision Making within the American Family," 17 *Fam.L.Q.* 1, 22 (1983).

## II

In developing that case-by-case analysis, comment on certain features of this case might assist parties in future judicial proceedings.

### Shared Decisionmaking

The President's Commission has stressed in its chapter on "The Elements of Good Decisionmaking" that "patient and provider collaborate in a continuing process intended to make decisions that will advance the patient's interests both in health (and well-being generally) and in self-determination." *President's Commission Report, supra,* at 43 (footnote omitted). In this case the primary care provider was personally opposed to the decision to withdraw the life-support apparatus. In his conscientious concern for his patient, however, he placed her in contact with a practicing psychologist who arranged for a respiratory specialist to explain to his patient the consequences of turning off the respirator.

In effectuating the patient's right to exercise an informed consent to medical procedures, it would assist a court to know that the primary care provider has counseled the patient with respect to that decision, which was done in this case. The

President's Commission stresses the role of the physician in this decisionmaking process:

The individual health care provider is likely to help dying patients most by maintaining a predisposition for sustaining life (while accepting that prolongation of dying may serve no worthwhile purpose for a particular patient). Indeed, this favoring of life is part of society's expectation regarding health care professionals. Commonly, it is supported by a personal belief or value commitment and by a recognition of the needs of dying patients for reassurance about the worth of their own lives. [*Id.* at 48 (footnote omitted).]

However, once it becomes quite clear that the patient is making an informed, deliberate, and voluntary decision to forego the specific life-sustaining procedures, then the physician, along with various other individuals, can serve different and valued functions to assist the patient acquiescing in death.

So clear and so overwhelming was Kathleen Farrell's acceptance of the inevitability of her death that the relief was warranted here. She did not believe that others wished her to die. It was quite clear from her discussions with the trial court that this was her own decision to accept the inevitability of death from the disease that afflicted her.

### Sharing The Decisions

One of the hopes of the *Quinlan* Court was that there would develop, in conjunction with area hospitals, a process to review medical ethical decisions. In the Court's view, the concept of an ethics committee, which would be readily accessible to those persons rendering care to patients, would be a promising direction for further study of such issues. *In re Quinlan, supra,* 70 *N.J.* at 49. Such a panel would have the dual benefit of diffusing the professional responsibility for a decision (comparable, in a way, to the value of multi-judge courts) and insuring the viability of the decisional process. *Id.* at 50. "In the real world and in relationship to the momentous decision contemplated, the value of additional views and diverse knowledge is apparent." *Ibid.*

In *In re Conroy, supra,* 98 *N.J.* at 384, in the context of an institutionalized, elderly person, we stated that the involvement

of two independent physicians for establishing the factual basis of the decision, and the concurrence of the ombudsman and available family members, would assure the correctness of the choice made.

In the context of this case, apart from the hospital setting, such a committee might have provided aid and counsel to a physician and family facing such a decision. The commencement of the decision to discontinue the life-supporting apparatus was first undertaken in November 1985. It was the patient's first discussion of such a choice. I believe that the availability of such a review panel would reinforce the ability of a guardian *ad litem* to present to the court any available medically acceptable alternatives that might assist the court in making a decision. As noted in this case, it appears clear that because of the nature of the disease, there were no reasonable alternatives that would have ameliorated the condition of the patient.

### Care for the Dying Patient

Once a valid decision to discontinue the life-supporting apparatus has been made, a court should consider its implementation. "[A] decision to forgo particular life-sustaining treatments is not a ground to withdraw all care—nor should caregivers treat it in this way, especially when care is needed to ensure the patient's comfort, dignity, and self-determination." *President's Commission Report, supra,* at 90. In this case the evidence suggested that Kathleen Farrell would die of suffocation within a matter of minutes if the respirator was disconnected. Hence the normal care due to a dying person described in the *President's Commission Report* would be of limited concern.

As noted, Kathleen Farrell's attending physician personally was opposed to discontinuing the respirator, but he conscientiously agreed to remain in attendance to comfort his patient. In addition, Kathleen Farrell had the service of an around-the-

clock nursing team. In other cases, I believe that a court will want to assure that care commensurate to the needs of the dying patient will be provided. The care and nurture of the dying, no less than the living, reflects one of the most fundamental aspects of our shared humanity. Provided that the means taken do not in fact add to the suffering and discomfort of the dying patient, as they did both here and in *Conroy,* the dying person should continue to receive the caring support of health providers.

To repeat, in this case all the evidence indicated that Kathleen Farrell's death from amyotrophic lateral sclerosis would not be needlessly prolonged and that her physician and her husband would be in attendance. I therefore concur in the judgment.

*For affirmance*—Chief Justice WILENTZ, Justices CLIFFORD, HANDLER, POLLOCK, O'HERN, GARIBALDI and STEIN—7.

*Concurring in result*—Justices CLIFFORD, HANDLER, POLLOCK and O'HERN—4.