250 N.J. Super. 265 (1991)
593 A.2d 1232
THERESA GLEASON, R.N., ELAINE TUTHILL, R.N., JERYL T. MAGLIO, PATRICIA E. MALONEY, R.N., ET AL., APPELLANTS,
v.
WILLIAM R. ABRAMS, ACTING OMBUDSMAN FOR THE INSTITUTIONALIZED ELDERLY FOR THE STATE OF NEW JERSEY, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Submitted June 4, 1991.
Decided July 31, 1991.
*267 Before Judges MICHELS, BRODY and D'ANNUNZIO.
Anne M. Perone, attorney for appellants.
Robert J. Del Tufo, Attorney General, attorney for respondent (Mary C. Jacobson, Deputy Attorney General, of counsel; Dennis J. Conklin, Deputy Attorney General, on the brief).
The opinion of the court was delivered by BRODY, J.A.D.
*268 This appeal challenges the facial validity of regulations promulgated by the Office of the Ombudsman for the Institutionalized Elderly (Ombudsman). As caretakers of institutionalized elderly, appellants are obliged by statute to report to the Ombudsman instances of suspected "abuse or exploitation" of the elderly that they learn about in the course of their employment. N.J.S.A. 52:27G-7.1. Appellants' main argument is that by including in the reporting requirement certain instances where "abuse" is defined as providing life-sustaining treatment, and by excluding certain instances where "abuse" is defined as withdrawing or withholding life-sustaining treatment, the regulations, which implement the statute, exceed the Ombudsman's statutory authority and are contrary to controlling Supreme Court decisions.
The pertinent part of the statutory definition of "abuse" appears in N.J.S.A. 52:27G-2a as follows:
"Abuse" means the willful infliction of physical pain, injury or mental anguish; unreasonable confinement; or the willful deprivation of services which are necessary to maintain a person's physical and mental health.
N.J.A.C. 5:100-1.2 repeats the statutory definition and particularizes two instances of abuse and one instance of nonabuse:
"Abuse" shall also mean imposing treatment upon a resident who has the capacity to make healthcare decisions, after the resident has made a voluntary and informed choice regarding such treatment. "Abuse" shall also mean providing to a resident treatment that is not medically indicated.... "Abuse" also shall not mean the withholding or withdrawal of life-sustaining treatment in accordance with the provisions of N.J.A.C. 5:100-2.
N.J.A.C. 5:100-2.3(d) excludes certain instances of withholding or withdrawal of life-sustaining treatment from the requirement to report "abuse":
The reporting procedures set forth in this section shall not apply when:
1. The resident is under age 60[[1]]; or

*269 2. The resident, being fully informed and having the capacity to make a healthcare decision, chooses to withhold or withdraw life-sustaining treatment. The resident's attending physician shall make the determination of whether the resident is fully informed and has the capacity to make a healthcare decision. The physician's determination shall be based on the physician's reasonable medical judgment and shall be documented on the resident's chart; or
3. The life-sustaining treatment is not medically indicated for the resident. The resident's attending physician shall make this determination. Such determination shall be based on the physician's reasonable medical judgment and shall be documented on the resident's chart; or
4. The proposal to withhold or withdraw life-sustaining treatment is being reviewed by, or has been reviewed favorably by, a court of competent jurisdiction.
We first discuss the Ombudsman's authority to supplement the statutory general definition of "abuse" with examples that include instances of providing life-sustaining treatment and exclude instances of withholding or withdrawing such treatment. The requirement to report to the Ombudsman instances of abuse and exploitation of institutionalized elderly is found in the act that created the Office of the Ombudsman. N.J.S.A. 52:27G-1 et seq. The act gives the Ombudsman the "authority to adopt and promulgate pursuant to law such rules and regulations as he deems necessary to carry out the purposes of this act." N.J.S.A. 52:27G-5d.
Our standard of review is limited:
An agency rule or regulation is presumptively valid, and anyone challenging such a rule or regulation has the burden of proving its invalidity. [Citation omitted.] This presumption of validity attaches if the regulation is within the authority delegated to the agency and is not on its face beyond the agency's power. [Citation omitted.] An administrative regulation, however, cannot alter the terms of a statute or frustrate the legislative policy. [Citation omitted.] This Court, nonetheless, "places great weight on the interpretation of legislation by the administrative agency to whom its enforcement is entrusted." Peper v. Princeton Univ. Bd. of Trustees, 77 N.J. 55, 69-70, 389 A.2d 465 (1978).
Medical Society v. Department of Law and Public Safety, 120 N.J. 18, 25-26, 575 A.2d 1348 (1990).
Until the recent enactment of the New Jersey Advance Directives for Health Care Act (Advance Directives Act), L. 1991, c. 201, the Legislature had not declared a policy that *270 either recognized or rejected the right of a person to refuse life-sustaining treatment. The Advance Directives Act now establishes procedures for lawfully withholding and withdrawing life-sustaining treatment from a person who has executed a written advance directive on the subject. Section 22 of the Advance Directives Act cautions that the act's provisions "do not apply to persons who have not executed an advance directive." Nonetheless, Section 2b contains a broad legislative declaration: "This State recognizes the inherent dignity and value of human life and within this context recognizes the fundamental right of individuals to make health care decisions to have life-prolonging medical or surgical means or procedures provided, withheld, or withdrawn." A regulation that defines abuse to include denying an institutionalized elderly person that "fundamental right" undoubtedly expresses the Legislature's declared intent. Section 26 directs the Ombudsman to "conform and implement procedures necessary to comply with the requirements" of the Advance Directives Act.
Furthermore, in some circumstances a person's constitutional right of self-determination includes the right to refuse medical treatment, even life-sustaining treatment. In re Quinlan, 70 N.J. 10, 38-41, 355 A.2d 647 (1976), cert. denied sub nom. Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976). That right may be asserted directly or, when the person is physically or mentally unable to do so, by a surrogate decision-maker. Id. 70 N.J. at 41-42, 355 A.2d 647. Referring to the role of the Ombudsman in such cases, the Court has said, "The new [1983] provisions [of the act creating the Office of Ombudsman] regarding abuse of the elderly create a vehicle for safeguarding the rights of elderly, institutionalized, incompetent patients both to receive medical treatment and to refuse life-sustaining medical treatment under certain circumstances." Matter of Conroy, 98 N.J. 321, 379, 486 A.2d 1209 (1985). Thus the Ombudsman had the clear authority, indeed the obligation, to define abuse to include, in certain circumstances, providing *271 life-sustaining treatment and to exclude, in certain circumstances, withholding or withdrawing life-sustaining treatment.
The more difficult question is whether the regulations under review correctly define the circumstances in which the constitutional right may be exercised. We consider this question on the assumption that in view of the enactment of the Advance Directives Act the regulations no longer apply in cases involving life-sustaining treatment where there has been a written advance directive as defined by that act. In such cases, the regulations appear to have been superseded by the detailed provisions of the Advance Directives Act. The regulations continue to apply in other cases where the Legislature has not provided express guidance.
A constitutional right may not be defeated by the absence of legislative guidelines on the subject. "In Quinlan, we realized that in the absence of legislation, the responsibility of establishing procedural guidelines for the effectuation of decisions to withdraw life-support is incumbent upon the court." Matter of Jobes, 108 N.J. 394, 420, 529 A.2d 434 (1987). We must therefore determine whether the regulations in question, as they are applied to cases involving life-sustaining treatment, conform to corresponding guidelines enunciated in the decisions of the Supreme Court.
The first two examples of "abuse" in N.J.A.C. 5:100-1.2 refer to conduct that does not necessarily implicate life-sustaining treatment. The first example is "imposing treatment upon a resident who has the capacity to make healthcare decisions, after the resident has made a voluntary and informed choice regarding such treatment." N.J.A.C. 5:100-2.2 defines "capacity to make a healthcare decision" to mean "the ability to understand and appreciate the nature and consequences of a healthcare decision, including the resident's diagnosis and prognosis, the benefits and risks associated with the decision and alternatives to the decision, and having the ability to voluntarily reason and make judgments about that information."
*272 "[A] competent adult person generally has the right to decline to have any medical treatment initiated or continued." Matter of Conroy, supra, 98 N.J. at 347, 486 A.2d 1209. The Court quoted Judge Cardozo as follows: "Every human being of adult years and sound mind has a right to determine what shall be done with his own body; and a surgeon who performs an operation without his patient's consent commits an assault, for which he is liable in damages." Schloendorff v. Society of New York Hosp., 211 N.Y. 125, 129-130, 105 N.E. 92, 93 (1914). Even where the rejected treatment will sustain life the key issue in such a case, assuming the decision was made knowingly and voluntarily, is not the effect of the person's rejection of medical treatment but whether the person is competent to make the decision. Matter of Farrell, 108 N.J. 335, 354, 529 A.2d 404 (1987).
Conroy defined competence in this context by quoting the definition of informed consent found in Wanzer, Adelstein, Cranford, Federman, Hook, Moertel, Safar, Stone, Tarusig & Van Eys, "The Physician's Responsibility Toward Hopelessly Ill Patients," 310 New Eng.J.Med. 955, 957 (1984):
There are three basic prerequisites for informed consent: the patient must have the capacity to reason and make judgments, the decision must be made voluntarily and without coercion, and the patient must have a clear understanding of the risks and benefits of the proposed treatment alternatives or nontreatment, along with a full understanding of the nature of the disease and the prognosis. [Conroy, supra, 98 N.J. at 347, 486 A.2d 1209.]
The first regulatory example of "abuse," including the definition of "capacity to make a healthcare decision," conforms with these Supreme Court guidelines.
The second example of "abuse" in N.J.A.C. 5:100-1.2 is "providing to a resident treatment that is not medically indicated."[2] There is nothing in this example, at least facially, to suggest that it does more than recognize that providing medically *273 inappropriate treatment is abuse. In the context of providing life-sustaining treatment, the regulation in question deems it an abuse to provide life-sustaining treatment where life is not at risk. So understood, this is a reasonable example of abuse.
The third regulatory supplement to the statutory definition of abuse refers to conduct related to life-sustaining treatment that is not abuse: "the withholding or withdrawal of life-sustaining treatment in accordance with the provisions of N.J.A.C. 5:100-2." Two of the examples in N.J.A.C. 5:100-2 require discussion.
N.J.A.C. 5:100-2.3(d)2 provides:
The resident, being fully informed and having the capacity to make a healthcare decision, chooses to withhold or withdraw life-sustaining treatment. The resident's attending physician shall make the determination of whether the resident is fully informed and has the capacity to make a healthcare decision. The physician's determination shall be based on the physician's reasonable medical judgment and shall be documented on the resident's chart; . ..
The focus of the example is not on whether a competent person has the right to refuse life-sustaining treatment, but rather on the procedures required for determining whether the person is competent. The Supreme Court established the appropriate guidelines in Farrell, a case where the recipient of life-sustaining treatment was at home, as follows:
Nevertheless, we do realize that society must ensure that a patient who has decided to forgo life-sustaining treatment is competent; is informed about his or her prognosis, the medical alternatives available, and the risk involved; and has not been coerced. These issues are more easily resolved when the patient is in a hospital, nursing home, or other institution, because in those settings the patient is observed by more people. To protect the patient who is at home, we require that two non-attending physicians examine the patient to confirm that he or she is competent and is fully informed about his or her prognosis, the medical alternatives available, the risks involved, and the likely outcome if medical treatment is disconnected.[8] [Farrell, supra, 108 N.J. at 356, 529 A.2d 404.]
By substituting the opinion of only the attending physician for the required opinions of "two non-attending physicians," the regulation conflicts with the Supreme Court guideline and must be modified accordingly.
*274 In arguing that Farrell applies only to patients living at home, not to patients who are institutionalized, the Ombudsman overlooks the text of footnote 8 in the Farrell opinion: "The procedure we hereby establish for determining the competency of a patient at home who has decided to forgo life-sustaining treatment is likewise applicable to patients in hospitals and nursing homes."
The other example of when withholding or withdrawal of life-sustaining treatment is not abuse is found in N.J.A.C. 5:100-2.3(d)3, which provides:
The life-sustaining treatment is not medically indicated for the resident. The resident's attending physician shall make this determination. Such determination shall be based on the physician's reasonable medical judgment and shall be documented on the resident's chart; ...
Extending our discussion of the second example of abuse found in N.J.A.C. 5:100-1.2, we are satisfied that N.J.A.C. 5:100-2.3(d)3 correctly recognizes that withholding or withdrawing treatment not medically indicated is the product of the attending physician's objective medical judgment, not the patient's subjective judgment that must be carefully assessed before it is permitted to outweigh societal values that ordinarily forbid deliberately ending a life. It is not an abuse of an institutionalized elderly patient when the attending physician alone determines that life-sustaining treatment is not medically indicated because the patient's life is not at risk or is no longer at risk. Of course, the regulation does not prevent a caretaker from notifying the Ombudsman if the caretaker reasonably believes that the attending physician's determination was not based on a reasonable medical judgment and would therefore be abuse.
We are satisfied from a careful review of this record that the other issues raised are clearly without merit and require no further discussion. R. 2:11-3(e)(1)(E).
The regulations are sustained, except for N.J.A.C. 5:100-2.3(d)2 which requires modification consistent with this opinion.
NOTES
[1] The Ombudsman's jurisdiction is limited to institutionalized elderly, defined as "any person 60 years of age or older, who is a patient, resident or client of any facility." N.J.S.A. 52:27G-2i.
[2] N.J.A.C. 5:100-2.2 defines "medically indicated" to mean "treatment that will improve the medical condition of the resident or is necessary to provide palliative care to the resident."