156 N.J. Super. 282 (1978)
383 A.2d 785
IN THE MATTER OF ROBERT QUACKENBUSH, AN ALLEGED INCOMPETENT.
Superior Court of New Jersey, Morris County Court, Probate Division.
January 13, 1978.
*283 Mr. Clifford Starrett, for Morristown Memorial Hospital.
Mr. Martin Newmark, appointed as guardian ad Litem on behalf of Robert Quackenbush.
MUIR, A.J.S.C.
Morristown Memorial Hospital petitions for the appointment of a guardian for Robert Quackenbush, an alleged mental incompetent and patient at the hospital, to authorize the guardian to consent to an operation to amputate the legs of Quackenbush and to consent to other medical treatment necessary due to gangrenous conditions in both his legs.
The verified complaint asserts an advanced gangrenous condition in both legs and the incompetence of the patient to give his consent for the treatment. A treating physician's affidavit indicates extensive gangrene in both legs, the likelihood of one foot falling off and the probability of death within three weeks unless amputation and treatment occur.
Based on the complaint and the supporting affidavit, an order to show cause issued directing Quackenbush to show cause why the relief sought should not be granted. In absence of any next of kin being noted in the complaint and based on the allegation of mental incompetency, Martin Newmark, an attorney, was appointed guardian ad litem for Quackenbush.
An answer was filed on behalf of Quackenbush asserting his mental competency, his right of self-determination and seeking dismissal of the hospital's complaint.
An affidavit was filed by Martin Newmark setting forth that he had spoken with Quackenbush, that the latter was reasonably responsive to the attorney's questions, that he was aware of his condition and that he expressed "in no uncertain terms he had a right not to have the surgery performed *284 against his will." Mr. Newmark indicated that Quackenbush is lucid and aware of the consequences of his position and the alternatives available to him.
A plenary hearing was commenced within 24 hours of the issuance of the order to show cause.
The facts elicited at the hearing indicate that Robert Quackenbush is 72 years old and has lived as a semi-recluse of the last ten years in a trailer in Chester, New Jersey. He is divorced, has no children, his parents and siblings are deceased and he is unable to provide any significant information concerning relatives except for a Mrs. Kagan, an 83-year-old cousin with whom he lived in the trailer. The cousin is presently in a nursing care facility.
A local rescue squad brought Quackenbush to the hospital emergency room at the request of his neighbors. He refused treatment and was rambunctious and belligerent. Because of the refusal to accept treatment, hospital officials attempted to send him home, but all available agencies for transportation refused to transport him. Finally, he was admitted at the direction of Dr. Ames Filippone, who became his treating physician.
Dr. Filippone, mainly through other sources, but with some information from the patient, learned that Quackenbush was hospitalized about two months prior to his admission. At that time he was diagnosed as suffering from arteriosclerosis in the legs and advised to have an operation, but he refused and left the hospital. Aside from that hospitalization and medical attention, he shunned medical treatment for the prior 40 years. Dr. Filippone described him as a concientious objector to medical therapy.
A medical examination by Dr. Filippone indicates that Quackenbush has gangrene in both legs. On his left leg the skin is black from the knee down, is partially mummified and the foot is dangling, about to fall off. On the left leg, there is an open sore, which is draining fluid and in which the tibia (shinbone) and tendons are exposed. His right leg *285 is in a similar condition except that the black skin and mummified condition extend from midcalf down.
Neither leg has a normal pulse behind the knee or ankle, indicating total absence of blood flow. The blood is being seeded with bacteria from inflamed areas adjoining the gangrene. Cultures of the blood indicate the presence of gas-forming bacteria. Such bacteria can lead to gas gangrene, a more fulminating type infection than gangrene. The existence of bacteria multiplying in the blood is described as septicemia.
The diagnosis is that the gangrene is caused by arteriosclerosis (a thickening and hardening of arteries and other vessels leading to acute diminishment of blood flow) inducing high fever, dehydration and profound anemia (number of red blood cells being less than normal). At the time of admission to the hospital, Quackenbush had a 102° fever and an abnormally high pulse rate.
After commencement of treatment, which consisted of bandaging and heavy doses of two antibiotics, penicillin and gentamicin, the patient's temperature and pulse rate gradually became normal. Dr. Filippone described the doses of antibiotics as heroic measures, meaning quantities in highly unusual amounts. He indicated concentrated use of gentamicin could cause kidney failure.
Realizing his patient's aversion to an operation, Dr. Filippone discussed with Quackenbush carefully over a period of days the nature and extent of the illness, the nature and extent of the surgery, the risks involved in the operation and the risks involved if there is no operation. On January 5 Quackenbush signed a form consenting to the operation but later that day withdrew the consent.
Dr. Filippone's prognosis is that Mr. Quackenbush must have the operation or he will die within about three weeks. The antibiotics can control the infection only if the source of the infection is removed through amputation. If the source of the infection is not removed, the formation of bacteria in the blood will build to the point where abscesses will occur *286 on the legs, lungs, brain and other places. Fever will develop, become uncontrollable and ultimately lead to a comatose condition. The abscesses and fever will eventually result in death.
Death may be averted if the operation is performed. The operation will consist of removal of both legs just above the knee at the very least, and possibly removal of both legs entirely. Whether both legs must be removed entirely cannot be decided until the operation is underway. The probability of recovery from the amputation is good and the risks involved are limited.
The extent of the amputation will dictate whether Quackenbush will be confined to a wheelchair for the rest of his life or be a candidate for rehabilitation. If the amputations are of the entire legs, wheelchair confinement is the only alternative. If the amputations are restricted, leaving portions of the legs, he may be fitted with artificial legs for use in moving about. In either event, he will need nursing care which the hospital cannot provide.
A social worker from the hospital indicates it could take up to six months to place Mr. Quackenbush in a nursing home after the operation. She was unable to state with any certainty that the nursing home of placement would have rehabilitation facilities. She did say it was unlikely that Quackenbush could get into a complete rehabilitation facility due to his age and the fact that such a facility is normally for temporary treatment, not permanent, care.
The testimony concerning Quackenbush's mental condition was elicited from two psychiatrists. The first, appearing for the hospital, was Dr. Michael Giuliano. Dr. Giuliano, licensed to practice in 1971, saw Quackenbush once on January 6. The doctor's conclusions are that Quackenbush is suffering from an organic brain syndrome with psychotic elements. He asserts that the organic brain syndrome is acute  i.e., subject to change  and could be induced by the septicemia. He bases his opinion on the patient's disorientation as to place  not aware of being in a hospital; his *287 disorientation as to the people around him  not aware of talking to a nurse and doctor during the interview; his visual hallucinations  seeing but not hearing people in the room who are not there, and the inappropriateness of his responses to the discussions on the gravity of his condition and what might result. Dr. Giuliano did acknowledge that the hallucinations could be induced by conditions related to the septicemia but concluded that Quackenbush's mental condition was not sufficient to make an informed decision concerning the operation.
Dr. Abraham S. Lenzner, a Board-certified psychiatrist for 25 years and specialist in geriatric psychiatry, testified as an independent witness at the request of the court. Dr. Lenzner is Chief of Psychiatry at the Memorial Hospital and a professor at the New Jersey College of Medicine and Dentistry.
Dr. Lenzner is of the opinion, based upon reasonable medical certainty, that Quackenbush has the mental capacity to make decisions, to understand the nature and extent of his physical condition, to understand the nature and extent of the operations, to understand the risks involved if he consents to the operation, and to understand the risks involved if he refuses the operation. He bases that opinion on an interview with Quackenbush held on January 11. At the interview the doctor and Quackenbush thoroughly discussed the patient's condition, illness and ramifications involved in the options of having the operation. The doctor indicates that Quackenbush knows he has gangrene and fully appreciates the magnitude of the illness. Quackenbush told him he hoped for a miracle and that he is a coward about making decisions. The doctor found no hallucinations. He did find some fluctuations in mental lucidity. Quackenbush would lose his train of thought, and his discussion would wander off, but the doctor says this is to be expected under the circumstances and is not a sign of mental incompetency.
I visited with Quackenbush for about ten minutes on January 12. During that period he did not hallucinate, his *288 answers to my questions were responsive and he seemed reasonably alert. His conversation did wander occasionally but to no greater extent than would be expected of a 72-year-old man in his circumstances. He spoke somewhat philosophically about his circumstances and desires. He hopes for a miracle but realizes there is no great likelihood of its occurrence. He indicates a desire  plebeian, as he described it  to return to his trailer and live out his life. He is not experiencing any pain and indicates that if he does, he could change his mind about having the operation.
A trial on the issue of mental competency is authorized by statute, N.J.S.A. 3A:6-35. The rules of court implement the terms upon which such a trial should be conducted. R. 4:83. The matter may be tried before a judge without a jury. My findings pursuant to this authority are that Robert Quackenbush is competent and capable of exercising informed consent on whether or not to have the operation. I do not question the events and conditions described by Dr. Giuliano but find they were of a temporary, curative, fluctuating nature, and whatever their cause the patient's lucidity is sufficient for him to make an informed choice.
The hospital argues, however, that the court must make the decision in favor of compelling the operation. It describes the decision of Quackenbush in refusing the operation as an aberration from normal behavior. It equates the refusal to suicide and asserts a compelling state interest in preventing Quackenbush from refusing vital medical care and treatment. The hospital relies on John F. Kennedy Memorial Hosp. v. Heston, 58 N.J. 576 (1971).
Quackenbush asserts a constitutional right of privacy and right of self-determination, relying on In re Quinlan, 70 N.J. 10 (1976).
The Heston case involved a 22-year-old unmarried woman who, as the result of an automobile accident, required surgery. A blood transfusion was essential to the success of the operation. The blood transfusion was refused on religious *289 grounds. The refusal was made through the woman's parents since she was in shock at the time. (She later affirmed her parents' decision after successful surgery.)
The Supreme Court, in affirming the trial Court's decision to permit the transfusion, found that a compelling State interest in the preservation of life and the right of a physician to administer medical treatment according to his best judgment prevailed over the patient's religious claim justifying the Court's refusal to permit the patient (through her parents) to reject life saving medical assistance.[1]
In Quinlan a 22 year old girl was in a comatose condition on a respirator. The respirator, at the time, was essential to keep her alive. She was described by the testimony of doctors to be in a chronic persistent vegetative state which meant she had no cognitive functioning and no reasonable prospect of returning to a cognitive or sapient life. There was no medical procedure available to improve her condition.
Chief Justice Hughes, after recognizing the unwritten constitutional right of privacy, stated in Quinlan:
Presumably this right is broad enough to encompass a patient's decision to decline medical treatment under certain circumstances, in much the same way as it is broad enough to encompass a woman's decision to terminate pregnancy under certain conditions. [70 N.J. at 40; citations omitted]
He then pointed out the State's interest weakens and the individual's right of privacy grows as the degree of bodily invasion increases and the prognosis dims, until the ultimate point when the individual's rights overcome the State's interest in preserving life. Id. at 41. The Quinlan decision distinguished Heston, noting that a blood transfusion is a minimal bodily invasion and that the woman had a potential for *290 vibrant health and long life. That distinction is viable in this case. Mr. Quackenbush is confronted with a significant bodily invasion and does not have the long life and vibrant health potential.
The extent of the bodily invasion required to overcome the State's interest is not defined in Quinlan. Further, there is a suggestion of a need for a combination of significant bodily invasion and a dim prognosis before the individual's right of privacy overcomes the State's interest in preservation of life. Under the circumstances of this case, I hold that the extensive bodily invasion involved here  the amputation of both legs above the knee and possibly the amputation of both legs entirely  is sufficient to make the State's interest in the preservation of life give way to Robert Quackenbush's right of privacy to decide his own future regardless of the absence of a dim prognosis.[2]
No decision of this nature is easily made. Always present is the predominant interest in the preservation of life. But constitutional and decisional law invest Quackenbush with rights that overcome that interest.
Quackenbush, therefore, as a mentally competent individual, has the right to make his informed choice concerning the operation and I will not interfere with that choice.
NOTES
[1] A later case, In re Osborne, 294 A.2d 372 (D.C. Ct. App. 1972), set the patient's valid and knowing choice for the course of his life as the governing criterion when balanced against the State's interest in the preservation of life.
[2] Dim prognosis is interpreted to mean no successful operation can take place that will return the patient to a cognitive sapient life. The operation in this case is projected to be successful. Dim prognosis is not interpreted to mean a successful operation with possible lifetime confinement to a wheelchair or, alternatively, dependence upon artificial legs and prosthetic devices in remaining years that will be spent at a nursing home. If the latter interpretation was considered, then certainly, in Quackenbush's eyes, there is a dim prognosis.