250 N.J. Super. 307 (1991)
593 A.2d 1256
IN THE MATTER OF MARIE MOORHOUSE.
Superior Court of New Jersey, Appellate Division.
Argued February 20, 1991.
Decided August 5, 1991.
*308 Before Judges MICHELS, GRUCCIO and D'ANNUNZIO.
Cecelia Urban, Assistant Deputy Public Advocate, argued the cause for appellant Public Advocate (Wilfredo Caraballo, Public Advocate, attorney; Sarah Wiggins Mitchell, Director, Division of Advocacy for the Developmentally Disabled, of *309 counsel; Cecelia Urban, and Joseph B. Young, Deputy Public Advocate, on the brief).
Alice B. Cesaretti, Deputy Attorney General, argued the cause for respondent Division of Developmental Disabilities, Department of Human Services (Robert J. Del Tufo, Attorney General, attorney; Dennis J. Conklin, Deputy Attorney General, of counsel; Alice B. Cesaretti, on the brief).
Linda T. Pirolli, guardian ad litem, filed a brief.
The opinion of the court was delivered by GRUCCIO, J.A.D.
This case concerns an issue of first impression in New Jersey: the removal of life support from a never-competent resident of a state hospital who has been retarded since birth.
Marie Moorhouse was born in 1940 with Down's Syndrome. Since 1947, she has resided at the Vineland Developmental Center (VDC), an institution operated by the New Jersey Department of Human Services, Division of Developmental Disabilities (DDD). In 1967, the DDD's Bureau of Guardianship Services (BGS) was appointed Moorhouse's guardian, pursuant to N.J.S.A. 30:4-165.1 to -165.6.[1]
On May 27, 1990, Moorhouse was found breathless and pulseless in her residential unit at VDC. She was immediately brought to the VDC emergency room, where she was resuscitated. Moorhouse was then sent to the intensive care unit and connected to a respirator. She has never regained consciousness and continues to be connected to a respirator.
On August 28, 1990, Chester Miros, Ph.D., Chief of BGS, wrote to the Public Advocate stating his intention to bring guardianship proceedings for Moorhouse. Dr. Miros stated *310 that Moorhouse was "brain dead," on life support and that Barbara Horan, her sister and only known relative, wished to become Moorhouse's legal guardian in order to make medical decisions for her. BGS apparently did not institute court proceedings allowed by N.J.S.A. 30:4-165.4 to .16 to have Moorhouse judicially declared incompetent and to have Horan replace BGS as guardian.
On November 2, 1990, Alice Cesaretti, Deputy Attorney General, notified the Public Advocate that Moorhouse was "brain dead" and that Horan had asked that the respirator be disconnected. She stated that the hospital's prognosis committee would be meeting on the following Thursday to decide whether to concur with Horan's decision. If it did concur, the respirator would be disconnected.
On November 8, 1990, the Public Advocate filed a verified complaint and order to show cause with temporary restraints in the Superior Court, Chancery Division, Probate Part, Cumberland County. It sought to restrain removal of life-support treatment from Moorhouse.
The assigned judge heard oral argument on November 8, 1990, appointed Linda Pirolli, Esq., as guardian ad litem for Moorhouse and instructed her to review Moorhouse's records, interview the VDC hospital staff attending Moorhouse, Moorhouse's treating physicians and her sister and review all DDD records on Moorhouse. In addition, the guardian ad litem was directed to "submit written recommendations as to the legal standards which should be used and the procedures which should be followed before implementing any decision to terminate life-sustaining treatment for Ms. Moorhouse." The judge then signed a revised order to show cause returnable November 16, 1990, restraining the withdrawal of life support from Moorhouse until further order of the court.
On November 16, 1990, the trial judge received briefs from the Public Advocate, the Attorney General and the guardian ad litem and made the guardian ad litem's report part of the *311 record. The report indicates that the guardian ad litem had reviewed Moorhouse's medical records, had visited Moorhouse, and had spoken with Horan. Although the report does not make it clear whether all members of the VDC prognosis committee, including Dr. Asha Gandhi, Moorhouse's treating physician, were interviewed, the guardian ad litem orally reported that she indeed had spoken with Dr. Gandhi.
The guardian ad litem produced several members of the prognosis committee at the November 16, 1990 hearing and requested that the court consider hearing their testimony with regard to the appropriateness of Moorhouse's sister being named guardian and the precise nature of Moorhouse's medical condition. However, the trial judge heard no testimony from any committee member, stating: "I will not require the testimony of the other members of the Developmental Center who are present. I am satisfied that the record itself today is clear and convincing respecting the medical condition of this patient, and the issue simply is does the sister qualify." At that point, the record consisted of the parties' and guardian ad litem's briefs and oral statements. With the exception of Moorhouse's sister, there was no testimony given by anyone at either hearing. The only medical records of Moorhouse submitted to the court were uncertified copies of five pages of handwritten "progress notes" of two doctors contained in an Exhibit in DDD's trial brief.
After hearing Horan's testimony on November 16, 1990, the trial judge found that Horan had a sincere lifelong interest in Moorhouse's welfare, that she had no improper motives and that she would not gain financially from Moorhouse's death. He then appointed Horan to act as Moorhouse's guardian with the power to terminate Moorhouse's life-support treatment and denied the Public Advocate's request for a stay of the order. Following an application for emergent relief, we stayed the authorization to terminate life support pending the outcome of this appeal.
*312 In his opinion, the trial judge established a procedure to be followed before allowing removal of life-support treatment from DDD/BGS clients living in state institutions: When a state institution receives a request from a family member or friend to terminate life-support and the hospital medical-ethics committee concurs with the decision after two neurologists diagnose a persistent vegetative state, DDD shall, upon notification to the Public Advocate, apply to the court for the appointment of a guardian ad litem, even if the patient already has a guardian. The guardian ad litem, who must be an attorney, must file a report with the court within 10 days after appointment and, if desired, may obtain an independent neurological evaluation. A court hearing shall be conducted within five court days after the guardian ad litem's report is received. The court will use a clear and convincing evidentiary standard in determining whether a persistent vegetative state is confirmed and whether that determination confirms the propriety of the request to discontinue a life-support system.
A review of our Supreme Court's decisions in so-called right-to-die cases is a necessary predicate to our review of the procedures fashioned by the trial court in this case.
The case of In re Quinlan, 70 N.J. 10, 18, 355 A.2d 647 cert. den. sub nom. Garger v. New Jersey, 429 U.S. 922, 97 S.Ct. 319, 50 L.Ed.2d 289 (1976), concerned 21-year-old Karen Quinlan, who was in a persistent vegetative state. The Court held that Karen's family and guardian could elect whether to remove her from a respirator under the following conditions: (1) the patient's attending physicians must conclude that there was no reasonable probability of the patient emerging from her comatose condition to a cognitive, sapient state and that life-support systems should be discontinued; (2) upon concurrence of the patient's guardian and family, the physicians should consult with the hospital ethics committee or a like body and if it agrees that there is no reasonable possibility of the patient ever emerging from a comatose condition to a cognitive sapient state, the life-support system can be withdrawn without any *313 civil or criminal liability by any participant. Quinlan, supra, 70 N.J. at 54-55, 355 A.2d 647. The Court specifically noted that a judicial proceeding was not necessarily required for the above procedure. Id. at 55, 355 A.2d 647.
In re Conroy, 98 N.J. 321, 335-36, 486 A.2d 1209 (1985), involved an incompetent nursing-home patient who was awake and conscious, but with severely limited mental and physical functioning. The patient's guardian sought permission to remove a feeding tube from the patient. The Court held that because of the special vulnerability of mentally and physically impaired elderly persons in nursing homes and the potential for abuse with unsupervised institutional decision making in such homes, life-sustaining treatment should not be withdrawn from a nursing-home resident in the absence of a guardian's decision made in accordance with the tests set forth below. Id. at 381, 486 A.2d 1209. If the patient already has a general guardian, the court should determine whether that guardian is a suitable person to represent the patient with respect to the medical decision in question. Id. at 383, 486 A.2d 1209. Such a determination necessitates an inquiry into the guardian's knowledge of the patient and motivations or possible conflicts of interest. Id.
A necessary prerequisite to substitute decision-making by a guardian is that the patient has been proven incompetent to make the particular treatment decision for himself and that a guardian for the incompetent patient has been designated if the patient does not already have one. Id. at 381, 486 A.2d 1209. Such a determination is necessary even if the patient previously had been adjudicated an incompetent and had had a general guardian appointed pursuant to N.J.S.A. 3B:12-25. Id. at 382, 486 A.2d 1209. The procedure fashioned by the Court requires clear and convincing medical evidence of the patient's alleged incompetency. Id.
Evidence concerning the patient's condition is to be furnished by the attending physicians and nurses. Two other physicians *314 unaffiliated with the nursing home and attending physician are to be appointed to confirm the patient's medical condition and prognosis. Once the two physicians supply the necessary medical foundation, the guardian, with the concurrence of the attending physician or another physician chosen by the guardian, may withhold or withdraw life-sustaining medical treatment if he believes in good faith, based on the medical evidence and any evidence of the patient's wishes, that it is clear that one of the three tests set out in Conroy (subjective, limited-objective, or pure-objective) is met. Id. at 384, 486 A.2d 1209 (emphasis added).
The three tests established by the Court are as follows and apply to an elderly, formerly competent but presently incompetent nursing-home resident with severe and permanent mental and physical impairments and a life expectancy of approximately one year or less. Id. at 363, 365, 366, 486 A.2d 1209. Under the "subjective" test, when it is clear that the patient would have refused the treatment under the circumstances involved, life-sustaining treatment may be withheld or withdrawn from the patient. Id. at 360, 486 A.2d 1209. The limited-objective test applies when the patient has not unequivocally expressed his desires before becoming incompetent. Id. at 365, 486 A.2d 1209. Here, life-sustaining treatment may be withheld or withdrawn from a patient when there is some trustworthy evidence that the patient would have refused the treatment and the decision maker is satisfied that it is clear that the burdens of the patient's continued life with the treatment outweigh the benefits of that life for him and that the treatment would merely prolong the patient's suffering. Id. Under the "pure-objective" test, applicable when there is no trustworthy evidence that the formerly competent patient would have declined the treatment, the net burdens of the patient's life with the treatment should clearly and markedly outweigh the benefits that the patient derives from life. Id. at 366, 486 A.2d 1209. The recurring, unavoidable and severe pain of the patient's life with the treatment should be such that it would be inhumane to *315 administer life-sustaining treatment. Id. Ordinarily, court involvement will be limited to a determination of incompetency and the appointment of a guardian, unless a personal guardian has been previously appointed, who will determine whether the prescribed standards have been satisfied. Id. at 385, 486 A.2d 1209.
The Court held that while Quinlan suggested a decision-making procedure for comatose or chronic, persistent vegetative state patients, that procedure was not entirely appropriate to patients confined to nursing homes because of nursing-home patients' vulnerability, among other reasons. Id. at 358-59, 374-75, 486 A.2d 1209. The vulnerability of several groups of people, including mentally retarded people, was noted by the Court. Id. at 359, 486 A.2d 1209.
The Court explained, however, that it had not attempted to set forth guidelines for decision-making with respect to life-sustaining treatment in a variety of other situations not currently before it, such as the case of a never-competent adult suffering from a painful and debilitating illness, and held that "[w]e do not deem it advisable to attempt to resolve all such human dilemmas in the context of this case." Id. at 387-88, 486 A.2d 1209.
In the case of In re Grady, 85 N.J. 235, 240-42, 426 A.2d 467 (1981), the Court dealt with the attempts of parents to appoint a special guardian authorized to consent to sterilization of their daughter who suffered from Down's Syndrome and lived with them. The Court ruled that only a court, and not a guardian, could substitute for the incompetent's consent. Id. at 251, 426 A.2d 467. The Court recognized that this was a departure from Quinlan, but noted that the alternatives available in Quinlan were more clear-cut: the patient could continue to live indefinitely in a coma with the life-support system attached or she could have the apparatus removed and allow natural forces to take over, probably resulting in her death. Id. at 251 n. 4, 426 A.2d 467. Thus, in Quinlan, other than considering the medical *316 opinions to determine the chances for the patient's future recovery, there were few factors for a Court to weigh in deciding what was in the incompetent's best interest. Id. This was contrasted with the case in Grady, where the Court noted that sterilization of incompetents, especially the mentally impaired, has been the subject of abuse in the past and steps must be taken to ensure it is not permitted to continue. Id. at 252, 426 A.2d 467. In addition, the Court noted, sterilization of incompetents, along with such cases as adoption and custody cases, warrant close supervision by our courts. Id.
In re Farrell, 108 N.J. 335, 344-45, 529 A.2d 404 (1987), concerned the application of a husband to be appointed special medical guardian and to be given express permission to remove the respirator from his competent wife, who suffered from Lou Gehrig's disease and lived at home. The Court held that when dealing with an alleged competent patient living at home, in a hospital, or in a nursing home, two non-attending physicians must examine the patient to confirm that he is competent and fully informed about his prognosis, the medical alternatives available, risks involved, and likely outcome if medical treatment is disconnected. Id. at 356, 529 A.2d 404. The Court noted that judicial review of a competent patient's refusal of life-sustaining medical treatment is generally inappropriate and is useful only in unusual circumstances, such as a conflict among the physicians, family member, or other health-care professionals. Id. at 357, 529 A.2d 404.
In re Peter, 108 N.J. 365, 370-71, 529 A.2d 419 (1987), involved the application of a close friend designated to make surrogate medical decisions for Hilda Peter to be appointed her guardian. The Court noted that elderly nursing-home patients in the persistent vegetative state are threatened by the same conditions that put patients like Ms. Conroy at risk, i.e., an uneven level of care, minimal medical supervision and frequent lack of family support. Id. at 383, 529 A.2d 419. The Court then held that upon a surrogate's decision to withdraw or withhold life-sustaining medical treatment from an elderly nursing-home *317 patient in a persistent vegetative state, it must be determined whether the patient left clear and convincing evidence of his or her medical preference. Id. at 384-85, 529 A.2d 419. The Court noted that if a persistently vegetative patient's attitude toward life-sustaining treatment is not clear, the guidelines and procedures established in Quinlan and in In re Jobes, infra, are to be applied. Id. at 385, 529 A.2d 419. In every case, the ultimate decision is not for the Court and rather, is primarily that of the patient, competent or incompetent, and the patient's family or guardian and physician. Id. The Court also noted that in absence of a close family member or a specific designation by the patient of a close friend to make surrogate medical decisions on his behalf, a guardian for the patient must be appointed. Id. at 384-85, 529 A.2d 419.
In the case of In re Jobes, 108 N.J. 394, 400, 529 A.2d 434 (1987), the Court considered a husband's request to remove life-sustaining food and hydration systems from his comatose non-elderly wife who resided in a nursing home and had not adequately expressed her attitude toward such treatment prior to her entering a persistent vegetative state. The Court began its analysis by noting that the court does not decide whether to withdraw life-supporting treatment, but rather establishes criteria for those who make that decision which respect the right to self-determination while protecting incompetent parties. Id. at 399, 529 A.2d 434. In addition to the testimony of many nurses and nurses aides, medical experts testified for the Public Advocate, the guardian ad litem, the husband and the nursing home. Id. at 407, 408, 529 A.2d 434. These experts disagreed as to whether Jobes was in a persistent vegetative state or fell slightly outside the definition of such. Id. at 407, 529 A.2d 434. The Court reaffirmed its holding in Conroy that all medical determinations made in the course of a decision to withhold treatment from an incompetent person must be based on clear and convincing medical evidence. Id. The Court defined "clear and convincing" evidence as that which

*318 produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the fact finder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.
Id. at 407-08, 529 A.2d 434 (quoting State v. Hodge, 95 N.J. 369, 376, 471 A.2d 389 (1984) (citations omitted)). The Court found clear and convincing evidence had been given in the form of testimony by several medical experts, notwithstanding the fact that they had been contradicted by the nursing home's expert's testimony and reports. Id. 108 N.J. at 408, 529 A.2d 434. The Court then noted that in any case involving a patient in a persistent vegetative state, "we look primarily to Quinlan for guidance" and do not apply any of the tests set out in Conroy. Id. 108 N.J. at 413, 529 A.2d 434. Any provision for judicial review of this procedure is unnecessary and "impossibly cumbersome." Id. at 421, 529 A.2d 434. With regard to the opinions of the patient's family members, the Court noted that they are the proper parties to make a substituted medical judgment on the patient's behalf, id. at 415, 529 A.2d 434 (citing Quinlan, supra, 70 N.J. at 41, 355 A.2d 647), not only because of their peculiar grasp of the patient's approach to life, but also because of their special bonds with him or her. Id. at 416. This applies even to family members' substituted judgments about medical treatment for irreversibly vegetative patients who did not clearly express their medical preferences while they were competent. Id. 108 N.J. at 418, 529 A.2d 434. However, in the absence of family members who are a spouse, parents, adult children, or siblings, there should be no deference to relatives of the patient and a guardian would have to be appointed unless the attending health-care professionals determine that another relative functions in the role of the patient's nuclear family and should be treated as a close and caring family member. Id. at 419, 529 A.2d 434. In addition, whenever a health-care professional becomes uncertain about whether any family members are properly protecting a patient's interests, termination of life-support treatment should not occur *319 without the appointment of a guardian. Id. at 419, 529 A.2d 434.
The Court also noted that the "substituted judgment" approach to decision making for patients in the persistent vegetative state "is our ideal" and that in some cases, such as when the patient has always been incompetent, it may be unworkable. Id. at 424, 529 A.2d 434 (quoting President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, Deciding to Forego Life-Sustaining Treatment 132-33 (1983), for the proposition that "[t]he substituted judgment standard can be used only if a patient was once capable of developing views relevant to the matter at hand").
In a concurrence to Jobes, Justice Handler noted that where there is no basis for deciding what choice the patient would have made, courts must be alert to the possibility of abuse, which in this context included not only discontinuing treatment for patient who would have wanted it continued, but also the continuation of treatment for a patient who would have wanted treatment stopped. Jobes, supra, 108 N.J. at 431, 529 A.2d 434 (Handler, J., concurring).
Justice Pollock noted in a concurrence that with adults who have always been incompetent, it is practically impossible for anyone to ascertain their preferences. Jobes, supra, 108 N.J. at 449, 529 A.2d 434 (Pollock, J., concurring). When there is no evidence of a patient's preferences, the decision maker should focus on the best interests of the patient. Id. However, he noted that although "we must beware of the slippery slope that could lead to the unwarranted termination of life," courts are not the right place to make utilitarian judgments about the value of human life. Id. For patients in a persistent vegetative state, the focus should be on the likelihood of the patient's return to a cognitive and sapient life. Id. (citing Peter, supra, 108 N.J. at 374, 529 A.2d 419; Quinlan, supra, 70 N.J. at 51, 355 A.2d 647).
*320 The vulnerability of mentally retarded persons recently noted by our Supreme Court in Conroy, Peter, Grady and by Justice Handler in his concurring opinion in Jobes has historically been recognized in this state. As a result, New Jersey courts have zealously safeguarded the personal and property rights of incompetent parties. East Paterson v. Karkus, 136 N.J. Eq. 286, 289, 41 A.2d 332 (1945). This case deals with the most important right of a mentally retarded person: her right to life. Our concern for ensuring that they are afforded this right is not diminished by their residency in a state hospital, rather than a private hospital or nursing home. With a ward of the State such as Moorhouse, the State acts in parens patriae and thus, has a much higher interest in ensuring that the patient's rights are protected. Consequently, a clear and convincing standard of evidence of the patient's medical condition must be met before consideration is given to removal of life support from the patient.
The Court in Quinlan and Jobes specifically rejected judicial review of the established procedure, once all its elements were met, as unnecessary and "impossibly cumbersome" unless there was a dispute between the members of the patient's family, the guardian and the physicians involved. Jobes, supra, 108 N.J. at 421, 423-24, 529 A.2d 434. However, Quinlan and Jobes did not consider the case of a never-competent ward of the State who, for the reasons explained above, requires an enhanced degree of protection. This protection can be provided by the public advocate's involvement as shown below.
We agree with much of what the trial judge said in his opinion, but modify the trial judge's suggested procedure for removal of life support from a never-competent ward of the State as follows: Upon the determination of family member(s) or friend(s) of an institutionalized mentally retarded patient to withdraw life support from the patient, with the concurrence of the attending physician, the hospital's prognosis committee and at least two independent physicians knowledgeable in neurology that the patient is in a persistent vegetative state with no *321 reasonable possibility of recovering to a cognitive, sapient state, notice of that determination shall be sent to the Public Advocate for further review. The Public Advocate will review the medical records and undertake any other review needed to satisfy it that the family/medical decision is well founded, including, if it so chooses, interviewing the physicians and family member(s)/friend(s) making the application, visiting the patient and, if necessary, seeking an independent medical opinion. If, after its review, the Public Advocate determines that there is no reasonable basis upon which to challenge the decision, judicial involvement is unnecessary.
However, if any one of the involved parties, including the Public Advocate, disagrees with the decision to terminate life support, the decision cannot be implemented without a court order. The court shall appoint a guardian ad litem to represent the ward's interest,[2] visit the ward and all involved parties and file a report to the court. If the court finds that the movant has produced clear and convincing evidence (1) that the ward is in a persistent vegetative state with no reasonable possibility that he or she might recover to a cognitive sapient state, (2) that the ward's interests have been sufficiently protected and (3) that the movant would be a proper guardian for the patient, the judge shall allow the family member/friend to remove life-support treatment from the patient.[3]
*322 Here, while we generally agree with the trial judge's discussion of the law, we are concerned about his evidentiary rulings, his hurried pace and his refusal to hear the medical witnesses present in the courtroom. The trial judge found clear and convincing evidence regarding Moorhouse's medical condition, stating:
based upon clear and convincing evidence from the testimony presented today, that the request [to remove life-support equipment] has been made, that the hospital medical ethics committee concurs with that opinion, and that two neurologists have confirmed that Miss Moorhouse is presently living in a vegetative state and that she will never become a sapient, competent individual were she to be maintained on life support systems in the future.
Although the evidence presented at the two hearings suggested that Moorhouse was in a persistent vegetative state with no chance of recovery, the only testimony heard was that of Horan. The guardian ad litem produced several members of the VDC prognosis committee who she suggested give oral testimony. However, the trial judge inexplicably refused to hear the testimony of any of them, although they were present in the courtroom and prepared to testify. The judge nevertheless found clear and convincing evidence of the hospital medical ethics committee's and neurologists' findings and of Moorhouse's medical condition without hearing the testimony or admitting the records of any doctor or medical expert although readily available in court. Horan is not an expert in the field of medicine and did not attempt to be qualified as such. She is a caring and loving sibling. The only document contained in the record was the report of the guardian ad litem. This document contained a synopsis of the case, recommendations and a discussion of applicable case law. Thus, the record was virtually devoid of admissible credible medical evidence of Moorhouse's condition. Because the trial judge's findings were not based on sufficient credible evidence in the record, we reverse his finding of clear and convincing evidence of Moorhouse's medical condition. *323 Rova Farms Resort v. Investors Ins. Co. of America, 65 N.J. 474, 484, 323 A.2d 495 (1974); State v. Johnson, 42 N.J. 146, 162-63, 199 A.2d 809 (1964).
We also take issue with the trial judge's refusal to grant a stay pending emergent appeal and his failure to promptly issue an order memorializing his oral allowance of removal of life support from Moorhouse. Both of these were clearly improper. The judge orally allowed Horan to remove life support on November 16, 1990. However, no order was entered memorializing the court's ruling until December 7, 1990, nearly a month later. The court should have immediately entered an order memorializing its ruling. It is clear to us that, but for the Public Advocate's intervention on a matter of such grave importance as this life and death issue, Moorhouse would most likely have died before the court had entered its decision on the matter and thus, prior to appellate review, including normal emergent review, of the trial judge's decision. Similarly, even if the trial judge had legitimate questions regarding the efficacy of the Public Advocate's request for an emergent stay, the court's denial of the Advocate's request for a stay pending emergent appeal nearly rendered Moorhouse's case moot. The hospital prognosis committee was scheduled to meet that afternoon and upon meeting, not only could have concurred, but did concur in the decision to remove life support from Moorhouse, allowing such removal to take place forthwith. Thus, if the deputy attorney general had not suggested restraint pending the Public Advocate's application to us and if we had not acted as we did in hearing the Advocate's emergent appeal without the trial judge's signed order, life support would have been removed from Moorhouse, almost certainly resulting in her death without the benefit of appellate review.
Moreover, there was no need for the trial judge to include in his procedure strict time frames in which the guardian ad litem must file a report to the court and following which the court must hold a hearing. Our Court Rules specifically allow judges *324 to relax or dispense with any rule which would result in an injustice in a pending action. R. 1:1-2. Hudson City Sav. Bank v. Hampton Gardens Ltd., 88 N.J. 16, 24 n. 5, 438 A.2d 323 (1981); DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428, 434-35, 267 A.2d 31 (1970); Enourato v. New Jersey Building Auth., 182 N.J. Super. 58, 65-67, 440 A.2d 42 (App.Div. 1981), aff'd, 90 N.J. 396, 448 A.2d 449 (1982).
The trial judge's decision is thus reversed and remanded for action consistent with this opinion.
Reversed and remanded.
NOTES
[1] In 1967, BGS assumed guardianship of mentally retarded clients without court proceedings because the clients' relatives had not expressed an interest in instituting legal proceedings to become the client's guardian. L. 1965, c. 59 § 87, 88.
[2] If the Public Advocate is the dissenting party, the court may determine that the appointment of a guardian ad litem is unnecessary.
[3] We take note of the recently enacted New Jersey Declaration of Death Act, which allows a declaration of death under certain circumstances where an individual's circulatory and respiratory functions can be maintained solely by artificial means and who has sustained irreversible cessation of all functions of the entire brain, including the brain stem. New Jersey Declaration of Death Act, L. 1991, c. 90. The Act also recognizes a religious exemption whereby a person may not be declared dead on the basis of neurological criteria if the licensed physician authorized to declare death has reason to believe that such a declaration would violate the patient's personal religious beliefs. The limited record here only allows us to recognize the existence of these issues, but not to further analyze their impact on this case.