3 A.3d 651 (2010)
416 N.J. Super. 222
In the Matter of J.M.
For Appointment of a Special Medical Guardian.
Docket No. P-036-10
Superior Court of New Jersey, Chancery Division, Bergen County.
Decided February 4, 2010.
*652 JoAnn Pietro, Springfield, and Robin Goldfischer, Ridgewood, for petitioner, The Valley Hospital (Wahrenberger & Pietro, LLP, attorneys).
Janet B. Lurie, Hackensack, guardian ad litem for J.M. (Law Office of Janet B. Lurie, attorneys).
Carol Hawk, Montvale, for J.M. (Rubenstein, Meyerson, Fox, Mancinelli and Conte, attorneys).
KOBLITZ, P.J.Ch.
This case is distinctive in its facts, but similar to other emergent medical situations where the Chancery Court must make an immediate life or death decision regarding whether or not to limit an individual's right of self-determination. The analysis here is useful in providing one example of a path through the competing concerns which inform these decisions. In a situation where the hospital's own psychiatrists disagreed as to J.M.'s[1] mental capacity, The Valley Hospital ("petitioner" or "hospital") sought the appointment of a special medical guardian to consent to life-saving dialysis treatment. This court found by clear and convincing evidence that J.M. was incompetent to refuse dialysis treatment because she denied that she would most likely die without dialysis.[2]
On January 27, 2010, J.M., a 42-year-old Jamaican home health aide, was admitted to the hospital with end-stage renal disease, hypertension, uremia, anemia, and lupus. J.M.'s treating physicians indicated dialysis was immediately necessary to save her life. Although her nephrologists indicated that without treatment J.M.'s condition would deteriorate and result in death by systematic organ failure, she refused to undergo dialysis.
On February 3, 2010, the hospital filed a verified complaint and an order to show cause for a hearing and appointment of a special medical guardian for J.M. pursuant to Rule 4:86-12. The verified complaint asserted J.M. was critically ill and lacked the mental capacity to consent to medical treatment. An affidavit from Dr. Mikhail Kotlov, J.M.'s treating board-certified nephrologist, indicated that treatment was necessary to save J.M.'s life. No alternative to dialysis was available. Kotlov asserted J.M. was of low to moderate risk of sustaining any complications from placing an access shunt for dialysis and any ancillary procedures. Two consulting psychiatrists who evaluated J.M. at the hospital also indicated by affidavit that she lacked the capacity to make decisions regarding her medical care at this time.[3] A social worker employed by the hospital certified that to the best of her knowledge J.M. had no family other than her seventeen-year-old son, and had neither a health care representative nor a health care directive.
J.M. was generally aware of the situation and refused dialysis treatment, contrary to medical advice. This court appointed Janet Lurie to act as counsel for J.M. at the expense of the hospital. In re Clark, 216 N.J.Super. 497, 524 A.2d 448 (App.Div.1987). Lurie submitted a comprehensive report after interviewing J.M., the assistant pastor of the church she attends, her doctors, other hospital personnel, *653 and the hospital social worker. She recommended to the court that a special medical guardian be appointed so that dialysis could begin, contrary to J.M.'s stated wishes. Thus, Lurie took on the role of guardian ad litem by virtue of her recommendation which was based on the best interests of J.M. rather than J.M.'s wishes. After receiving Lurie's report, the court immediately appointed a second attorney at the hospital's expense, Carol Hawk, to advocate for J.M.'s stated wishes.[4]
A plenary hearing was commenced within twenty-four hours of the issuance of the order to show cause. It was conducted on the record in open court with witnesses testifying by telephone. J.M. was able to hear the entire proceedings over the phone from a hospital room.
On January 27, 2010, J.M. was admitted to the hospital through the emergency room at the insistence of one of the agencies for whom she works. Upon arrival, J.M. suffered from a shortness of breath and other symptoms of anemia. She consented to a blood transfusion which alleviated her symptoms from anemia, making her feel better without addressing the underlying renal failure.
Kotlov, J.M.'s treating nephrologist, testified at the hearing regarding her physical condition and need for treatment. She has a history of hypertension, lupus, and renal disease. J.M. was in irreversible kidney failure. The glomerular filtration rate ("GFR") places a value on the function of the kidney, with normal function being between 100 and 120. If the GFR is less than ten, a person should undergo dialysis. J.M.'s GFR was at one, indicating she was in dire need of treatment. In addition, Kotlov testified the blood urine nitrogen level ("BUN") is typically at around thirty in the healthy individual. A patient with a level at or about 100 is strongly considered for dialysis. As of February 4, 2010, J.M.'s BUN was 205. Kotlov further *654 stated that J.M. had agreed to undergo dialysis, changing her mind when the surgeon appeared to insert the catheter. J.M. had needed dialysis in the past, as her kidneys had been shutting down over a period of years, but at the time of the hearing her condition was critical and without treatment she would die.
J.M., who received an eighth grade education in Jamaica, worked as a home health care aide in local nursing homes through two different agencies. Shortly before the hearing, she rented a house in Hawthorne, New Jersey for $1000 per month to give her seventeen year old son a better school situation. J.M. relied on her hourly wage of $10 to $15 per hour to support herself and her son and understood that she had an insufficient work history to qualify for Social Security Disability should she be unable to work. J.M. was a devout Christian who carried the Bible with her and attended services regularly. Her pastor spoke to her in the hope of convincing her to accept dialysis treatment, but was unsuccessful.
Three consulting psychiatrists provided testimony regarding J.M.'s mental capacity. Dr. David Psemar, a board-certified psychiatrist experienced in capacity determinations, saw J.M. for a total of about three hours on January 30 and January 31, 2010. J.M. steadfastly denied any risk to her health in refusing dialysis because, according to her, God would cure her kidneys and prevent her from dying. While Psemar acknowledged some competent patients may refuse treatment due to religious beliefs, unlike these patients, J.M. did not acknowledge the risk in refusing treatment. In addition, J.M. was overridden with a fear of the dialysis machine, partially because, in her view, machines that duplicate bodily functions overly intrude into God's domain. Psemar noted that her fear was communicated to him in part by her concern that the word "die" is in "dialysis." J.M. had no worries about abandoning her son because she did not believe she would die.
Psemar determined that J.M. suffered from depression and an adjustment disorder due to the stress and anxiety caused by her illness. He believed her inability to understand the risk inherent in refusing dialysis demonstrated her lack of capacity. J.M. consented to blood transfusions and other medical interventions while at the hospital and expressed her desire to continue living, refusing a "Do Not Resuscitate" order. She clearly wished to live. Psemar indicated that the high BUN reading could indicate toxins remained in her blood causing mental confusion, but he could not draw a direct correlation between that condition and J.M.'s belief that God would save her without the need for dialysis.
Dealwis, the board-certified director of psychiatry at Valley Hospital, agreed substantially with Psemar. Dealwis examined J.M. on three occasions for a total of almost two hours. He determined that although J.M. was depressed, she did not want to die. Her refusal of dialysis was based upon her conviction that God had spoken directly to her and would save her, which Dealwis considered to be a delusional belief. She was oriented to time and place, but did not understand her medical condition, the purpose of the proposed procedures, or the risks to her health if dialysis were not performed. As he found no evidence of impaired higher cognitive functions, Dealwis did not think J.M. suffered from encephalopathy, a brain impairment resulting from toxins in the blood. Dealwis was aware that over the years J.M. had steadfastly refused to undergo dialysis. J.M. told him she used to suffer from tuberculosis and lupus but Jesus cured her. The reason her kidneys had not *655 healed was because of Satan's intervention. Dealwis concluded that J.M. lacked the capacity to refuse dialysis based on the fact that she heard the voice of God, as well as her strong conviction that she would be healed by divine intervention.
Dr. Arnold Scham, a licensed psychiatrist who works primarily in the area of hospice and palliative care, expressed a dissenting opinion. Scham saw J.M. one time for under an hour when she was first admitted. He believed J.M. was making a voluntary choice, understood the consequences, and had the capacity to refuse dialysis. Scham did not find J.M. to be delusional, and while he would not necessarily make the same decision to refuse treatment, he felt it was her right to do so. Scham commented that many mentally sound individuals believe that they speak to God. One person's beliefs may be considered delusional, while those same beliefs when held by a group of people are considered a religion. J.M. told Scham she was aware she might die, but everyone dies and she felt God would save her. In Scham's experience dealing with people facing end-of-life decisions, it is not uncommon for a person to make inconsistent decisions regarding treatment. When questioned about the fact that J.M. thought God saved her from lupus, but according to the doctors she still suffered from lupus, Scham stated it is not unusual for patients to disagree with their doctor's findings. Scham suggested that his disagreement with the other doctors concerning J.M.'s capacity resulted from the different perspective afforded a doctor dealing with terminally ill patients, who are generally allowed unlimited authority to refuse treatment.
Finally, J.M. testified regarding her refusal to undergo dialysis. J.M. attended a Christian Pentecostal church every Wednesday for over two hours and again on Sunday for one or two services. She prayed frequently and always kept a Bible with her. J.M. had worked as a certified nursing assistant and home health aid, and in that capacity she had come into contact with elderly people undergoing dialysis. She testified that they seem tired and drained after dialysis and she did not want to be like that. She also had financial concerns due to her reliance on steady work to support herself and her son. Dialysis would have to be done three afternoons a week for three to four hours for the foreseeable future. J.M. stated she was refusing dialysis because Jesus would heal her. When directly asked by the court if she was aware of the possible consequences of refusing treatment, she stated "I understand what they are saying to me ... I'm going to die, and I say I shall live and not die." She reiterated her desire to allow other medical treatment because she wanted to live. She refused dialysis, however, and did not believe that her refusal would result in death.
Before appointing a special medical guardian, the court must determine that the patient is unable to consent to medical treatment, no general or natural guardian is available, immediate medical treatment is necessary, and the patient has not designated a health care representative or executed a health care directive. R. 4:86-12. The parties in this matter agreed to all the factors except J.M.'s capacity[5] to refuse dialysis.
A patient has capacity to consent to medical treatment if she can reasonably understand her condition, the effect of the *656 proposed treatment, and the risks of both undergoing and refusing the treatment. In re Conroy, 98 N.J. 321, 382, 486 A.2d 1209 (1985) (citing In re Schiller, 148 N.J.Super. 168, 181, 372 A.2d 360 (Ch.Div. 1977)). Of the three psychiatrists who testified, two of them determined J.M. lacked capacity to refuse dialysis. Psemar indicated J.M. does not acknowledge the risk of refusing dialysis. She demonstrated anxiety, depression, and an inability to problem-solve. Dealwis testified J.M. did not believe she would die if not treated, and therefore, was not making a reasoned decision to choose death over dialysis. They both believed that because she did not understand the likely consequences of refusing treatment, she lacked capacity to make decisions about her health. The dissenting psychiatrist, Scham, acknowledged that he is not an expert in competency evaluations and only does five to six of them every year. He said J.M.'s mental status is clear and she has adequate judgment, but he also acknowledged her views were inconsistent in that she accepted blood transfusions and resuscitation, but not dialysis. Scham believed that J.M. understood she would die without dialysis, yet he also testified J.M. stated "God would save her." When J.M. herself testified, she asserted that she would not die without dialysis because Jesus would save her.
New Jersey law recognizes a competent adult's right to refuse life-saving medical treatment under both the right of privacy under the United States Constitution and the common-law right of self-determination. In re Conroy, supra, 98 N.J. at 349, 486 A.2d 1209 (ruling on the circumstances under which life-sustaining treatment may be withheld from incompetent, institutionalized, elderly patients with severe and permanent mental and physical impairments and a limited life expectancy). In In re Quackenbush, 156 N.J.Super. 282, 383 A.2d 785 (Cty.Ct.1978), a patient who suffered from fluctuations in cognizance and was not consistently lucid was held competent to refuse a surgical procedure to amputate his legs, despite the likely fatal result. The determination was based upon the patient's ability to understand the consequences of his decision. The patient was ruled competent to refuse treatment because he demonstrated an understanding of the likely consequences of such a decision. Id. at 282, 383 A.2d 785. During his interview with the Court, the patient stated he "hope[d] for a miracle but realize[d] there [wa]s no great likelihood of its occurrence." Id. at 288, 383 A.2d 785. A competent patient is able to choose his course of treatment even if his medical decision may seem irrational or unsupported by medical evidence.[6]In re M.R., 135 N.J. 155, 167, 638 A.2d 1274 (1994). If a patient is unable to understand the consequences of the decision, however, that patient is unable to give informed consent and is therefore incapacitated. In re Conroy, supra, 98 N.J. at 347, 486 A.2d 1209 (discussing the doctrine of informed consent which mandates that patients have *657 a "clear understanding of the risks and benefits of the proposed treatment alternatives or nontreatment, along with a full understanding of the nature of the disease and the prognosis" (quoting 310 New Eng. J. Med. 955, 957 (1984))).
The competency required to make medical decisions is comparable to that required to enter into a contract. In re Schiller, supra, 148 N.J.Super. at 180, 372 A.2d 360. As such, "[i]t is not necessary to show that a person was incompetent to transact any kind of business, but... it is sufficient to show that he was mentally incompetent to deal with the particular contract in issue...." Ibid. (quoting 17 C.J.S. Contracts § 133(1)). While J.M. was found competent to accept blood transfusions and execute a resuscitation order, this court finds her incompetent to make a determination regarding dialysis because she lacks the capacity to "weigh the options." In re Conroy, supra, 98 N.J. at 382, 486 A.2d 1209.
The court found, by clear and convincing evidence,[7] that J.M. does not have the capacity to make a decision regarding dialysis. She had no long-lasting psychiatric disability, but rather demonstrated a lack of understanding of the high risk of death without dialysis. She refused to acknowledge the risk inherent in her refusal of treatment and through her other medical choices had demonstrated an unequivocal desire to live.
Julie Karcher, Assistant Vice President of Interventional Services at the hospital, was appointed temporary special medical guardian of J.M. with the authority to consent to dialysis, and any ancillary procedures, until J.M.'s BUN and creatinine levels return to normal, at which time the court's decision would be reviewed upon application by the parties. It also was anticipated that J.M., after experiencing treatment and recognizing the consequences of refusing treatment, might choose to end dialysis.
Immediately after this decision was placed on the record, Hawk, on behalf of J.M., unsuccessfully sought a stay of the decision pending an emergent appeal. The following day J.M. had a dialysis treatment and was reported to be feeling better. J.M. chose not to pursue an appeal, and on February 24, 2010, by consent, Karcher was released as J.M.'s temporary special medical guardian.
NOTES
[1] Initials are used to preserve the confidentiality of the patient pursuant to Rule 1:36-3, Comment 6.
[2] This written decision follows an oral decision rendered immediately after the hearing on February 3, 2010.
[3] Affidavits were provided by Drs. David Psemar and W. Takshan Dealwis. Dealwis testified at the hearing.
[4] The appointment of a special medical guardian is governed by Rule 4:86-12 which, in addition to stating the standard to be applied by the court, sets forth that the procedure on such an application "shall conform as nearly as practicable to the requirements of R. 4:86-1 to R. 4:86-6 ..." Rule 4:86-4 sets forth what should be included in a court order for a hearing to determine whether a guardian (or a special medical guardian) shall be appointed. The order shall include the appointment by the court of counsel to represent the alleged incapacitated person, and, if necessary, a guardian ad litem. R. 4:86-4(b); R. 4:86-4(d). These two roles became distinct and separate after the revision of Rule 4:86-4 which was the result of the Court's ruling in In re M.R., 135 N.J. 155, 638 A.2d 1274 (1994). In competency matters, the court-appointed attorney's role is to prepare a report after interviewing knowledgeable persons and investigating the situation. The attorney represents the alleged incapacitated person pursuant to R.P.C. 1.14(a) as he or she would in any other legal dispute. In re Mason, 305 N.J.Super. 120, 701 A.2d 979 (Ch. Div.1997). While the attorney must be a zealous advocate, there are limits to his representation when "the decisions [of the alleged incompetent] are patently absurd or pose an undue risk of harm." Id. at 125, 701 A.2d 979 (quoting Supreme Court's Judiciary-Surrogates Liaison Committee, Guidelines for Court-Appointed Attorneys in Incompetency Matters, 1 (1995)). When such a situation arises, or other special circumstances exist, the court may appoint a guardian ad litem in addition to the court-appointed attorney. R. 4:86-4(d). The role of the guardian ad litem is to act as "eyes of the court" and further the best interests of the patient, even if those interests may differ from what the alleged incapacitated person wants. In re Mason, supra, at 127, 701 A.2d 979. Rule 4:86-4(b) indicates that the attorney writing the report to the court will advocate the wishes of the patient. However, although appointed as counsel, Lurie, in fact, advocated the best interests of J.M. as would a guardian ad litem pursuant to Rule 4:86-4(d). Thus, Hawk was appointed after Lurie's report was received to represent J.M. to advocate J.M.'s expressed views.
[5] In 1997, the New Jersey Legislature amended N.J.S.A. 3B:1-2. The amendment applied to the entire statute and replaced the term "mental incompetent" with "incapacitated person." L. 1997, c. 379. The terms are used interchangeably throughout this opinion.
[6] New Jersey courts have ruled that a patient found to be competent and aware of the consequences of her decision may exercise her right to refuse treatment for any reason, including when treatment violates the tenets of her religion. Further, guardians of incompetent patients must consider the tenets of a patient's religion when determining the proper course of treatment. In re Hughes, 259 N.J.Super. 193, 200, 611 A.2d 1148 (App.Div. 1992). J.M.'s refusal of treatment was not premised upon an established tenet of her religion precluding certain medical procedures, as evidenced by her consent to all other medical treatment and her pastor's attempt to convince her to undergo dialysis. As a result, her belief that God would save her does not preclude her from being found incompetent, nor does the appointed guardian need to act on that professed belief.
[7] The patient's alleged incapacitation must be established by clear and convincing evidence. In re Moorhouse, 250 N.J.Super. 307, 313, 593 A.2d 1256 (App.Div.1991) (citing In re Conroy, supra, 98 N.J. at 382, 486 A.2d 1209).